**UNITED STATES of America, Plaintiff,**

v.

**Melvin W. BAD HAND, Defendant.**

Crim. No. 95–30068.

United States District Court,
D. South Dakota,
Central Division.

May 21, 1996.

Thomas J. Wright, Assistant United States Attorney, Pierre, SD, for Plaintiff United States of America.

Thomas P. Maher, Maher & Arendt, Pierre, SD, for Defendant Melvin W. Bad Hand.

## ORDER

KORNMANN, District Judge.

Defendant filed a motion to suppress, Doc. 30. The Court submitted the motion to U.S. Magistrate Judge Mark Moreno pursuant to the provisions of 28 U.S.C. 636(b)(1)(B). The magistrate judge conducted three evidentiary hearings on the motion and submitted his Report and Recommendation For Disposition to the Court on May 9, 1996. A copy of such Report and Recommendation For Disposition was served upon the parties as required by 28 U.S.C. § 636. The defendant has filed written objections thereto, the Court having granted defendant an extension of time until 8:00 a.m. on May 21, 1996, to file such written objections.

The Court has made a de novo review of the record and transcripts herein and determines that the defendant's objections (including those filed on May 21, 1996) should be overruled and the findings and recommendations of the magistrate judge should be accepted and the motion to suppress denied.

Now, therefore,

IT IS ORDERED:

(1) The Report and Recommendation for Disposition of the U.S. Magistrate Judge filed May 9, 1996, is hereby adopted as the Findings of Fact and Conclusions of Law herein.

(2) This Court also finds that defendant's tribal attorney told him to take the polygraph examination and would not have changed his opinion and advice even if he had been able to be present for the examination in Kadoka, the tribal attorney having relied on defendant's statements to him as to his complete innocence. Such statements of defendant were consistent with his many denials given to law enforcement officials.

(3) The objections of defendant to the Report and Recommendation are overruled. The proposed findings of fact as urged by defendant on May 21, 1996, are rejected except as to B and H on page 4 of Doc 184 which are accepted as additional findings.

(4) The defendant's motion to suppress, Doc. 30, is denied.

## APPENDIX

### DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION FOR DISPOSITION

COMES NOW Defendant, Melvin W. Bad Hand, and makes the Objections to the Report and Recommendation (Docket No. 157) concerning the defendant's Motion to Suppress (Doc. 30).

This Court referred the defendant's Motion to Suppress to the Magistrate court pursuant to 28 U.S.C. 636(b)(1). (Doc. 33 and 41). 28 U.S.C. 636(b)(1), in relevant part, provides:

(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for disposition, by a judge of the court, of any motion excepted in subparagraph (A), ... Within ten days after being served with a copy, any party

may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall made a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the finding or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

Counsel for the Defendant received a copy of the Report and Recommendation herein, on the afternoon of May 9, 1996. The Defendant has made a written Motion for Continuance, based, in part upon the lack of sufficient time to adequately prepare these Objections to the Magistrate's report.

These Objections are summary in nature, in order to provide same to the Court, as trial in this matter is scheduled to commence May 21, 1996 at 9:00 o'clock a.m.

The Defendant has attached four photographs, of the basement of the Kadoka County courthouse, for the Court's consideration of the custodial interrogation issue in this case. The photos show the bench and law enforcement sign where Martha sat while Melvin Bad Hand was interrogated, the telephone that was used to contact Marian White Mouse in order to determine tribal Attorney Mesteth's whereabouts, and the interior of the interrogation room. The photographs also tend to establish that there was not window in the interrogation room, as referenced by Agent Davis.

### OBJECTIONS TO FACTUAL FINDINGS

1. The Defendant objects to the relevance of the factual finding that "Bad Hand never made mention of the fact that he was scheduled to take a polygraph examination", in order to suggest that the Defendant was not truthful with Attorney Mesteth. (Doc. 157 at page 3). The Government presented no showing that the Defendant's polygraph examination was scheduled on February 24, 1995. In fact Agent Asbury admitted that

she contacted a "third party", that her phone calls were "not direct", and "it took a while to arrange it." (Transcript of January 31, and February 2, 1996 Evidentiary Hearing page 11, hereafter EH 1).

2. The Defendant objects to the finding that Bad Hand approached Davis. (Doc. 30 at 4). Bad Hand requested an attorney, and communicated to Agent Davis that he wanted his attorney present for the polygraph interview. Agent Davis responded:

I said that he's probably a tribal attorney, but this is a federal charge, I do not believe that he's qualified to handle anything in federal court. (EH 1 at page 62).

3. The Defendant objects to the finding that Bad Hand agreed to take the polygraph examination and exam scheduling was discussed with him. (Doc. 30 at 4). The polygraph examination was scheduled by Agent Asbury, after the Defendant's interview on February 24, 1995. (EH 1 at 8 and EH 1 at 85).

4. The Defendant objects to the finding that Davis explained the polygraph and fairly advised Defendant of his constitutional rights. (Doc. 30 at 4). Defendant was told that since this was a federal case, tribal Attorney Mesteth was not qualified.

5. The Defendant objects to the finding that Bad Hand read and understood the "YOUR RIGHTS" and "CONSENT TO INTERVIEW WITH POLYGRAPH" forms. (Doc. 30 at 5). Defendant was improperly advised regarding his right to an attorney. Defendant was subjected to time pressure. Agent Davis offered legal advice and stated to Defendant that, if you are innocent, you should take the test.

6. The Defendant objects to the Magistrate finding that "he [Bad Hand] confirmed that he did in fact have sexual intercourse with T.K.". (Doc. 30 at 7).

7. The Defendant objects to any finding that he stated or related to Agent Davis that he had sex with Toni Renee Kimbler in December of 1993. (Doc. 30 at 7).

8. The Defendant objects to the finding that he read and proofed the words written by Agent Davis. (Doc. 30 at 7).

9. The Defendant objects to the finding that he acknowledged that the words written by Agent Davis were true and correct, that no threat promises had been made to him, and that he was aware that the statement could be used in court against him. (Doc. 30 at 7).

### Proposed Findings of Fact

A. Agent Davis made a discriminatory statement to deny Defendant's request for an attorney. (EH at 62). Orally, Agent Davis told Martha and Melvin Bad Hand that tribal Attorney Mesteth was not qualified. Shortly thereafter, Agent Davis advised Defendant of his right to an attorney.

B. Agent Davis did not reschedule or offer to reschedule polygraph examination.

C. Agent Davis offered legal advice to the Defendant on the decision to proceed with a polygraph examination.

H. Melvin W. Bad Hand has low level mental abilities, has a low I.Q. and has slow reading and communications ability. Please see testimony of Dr. Frank L. Dame. (EH 1 at 141–173 and EH 2 at 3–21 and EH 1 Exhibit A and EH 2 Exhibit A).

Magistrate Moreno's report does not address the issue of Agent Davis' acknowledged effort to dissuade the Defendant to wait for tribal Attorney Mesteth.

Credibility of Martha Bad Hand.

Agent Davis acknowledged that he was going to Rapid City. Martha Bad Hand recalled that Agent Davis was coming from Rapid City. Martha Bad Hand's entire testimony should not be deemed incredible, on this inconsistency. Martha Bad Hand and the Defendant understood that Defendant was not being arrested and that the polygraph test was over.

Defendant incorporates by reference his Motion to Suppress, with Statement of Authorities, as if fully recited herein. (Doc. 30).

### CONCLUSION

Plaintiff requests this court to enter an order that the purported "confession" statement of Melvin W. Bad Hand be excluded from the Government's case in chief for the reasons that (1) the statement was taken in violation of *Edwards v. Arizona,* alternatively, (2) the Government failed to establish by a preponderance of evidence that the statement was voluntarily taken from Defendant, (3) that Defendant voluntarily, knowingly and intelligently waived his Miranda rights, including the right to have an attorney, and (4) that Agent Davis interfered with the Defendant's request to have an attorney present at his polygraph examination, by the use of a discriminatory statement.

RESPECTFULLY SUBMITTED this 21st day of May, 1996.

MAHER & ARENDT

By: /s/ Thomas Maher
Thomas P. Maher, Attorney for
Melvin W. Bad Hand
201 North Euclid, Suite 1
Pierre, South Dakota 57501–2571

(605) 224–0491

### CERTIFICATE OF SERVICE

I, Thomas P. Maher, do hereby certify that I served a true and correct copy of the foregoing Plaintiff/Petitioner's Objections to Report and Recommendations for Disposition upon the persons next designated by mailing same by first class mail, postage prepaid, addressed as follows:

Mr. Thomas J. Wright, AUSA
337 Federal Building
225 S. Pierre Street
Pierre, SD 57501

DATED this 21st day of May, 1996.

/s/ Thomas P. Maher
Thomas P. Maher

### REPORT AND RECOMMENDATION FOR DISPOSITION

MORENO, United States Magistrate Judge.

Defendant, Melvin W. Bad Hand, filed a Motion to Suppress on January 19, 1996, Docket No. 30. Hearings on the Motion were later held on January 31, 1996, February 2, 1996 and March 20, 1996 in accordance

with the District Court's[1] January 24, 1996 Order Assigning Motion to U.S. Magistrate Judge, Docket No. 41. Because Bad Hand's Motion is a dispositive one, this Court is only authorized to determine the Motion on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following Report and Recommendation for Disposition of Bad Hand's Motion.

## PROCEDURAL HISTORY

Bad Hand, whose date of birth is September 17, 1962, was originally charged by indictment filed on September 21, 1995 with one Count of Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 1153 and 2241(a)(1). Subsequently, a Superseding Indictment was returned against Bad Hand charging him with Aggravated Sexual Abuse, Sexual Abuse and Abusive Sexual Contact in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2242(2), 2244, 2246(2)(A) and 2246(3). The Superseding Indictment alleges that Bad Hand sexually abused his teenage stepdaughter, T.K., between October, 1993 and April, 1994 on the Rosebud Reservation in South Dakota. Bad Hand has pled not guilty to all three Counts in the Superseding Indictment and is currently out on bond.

On January 19, 1996, Bad Hand filed a Motion to Suppress and requested a hearing. In his Motion, Bad Hand seeks "to suppress any and all statements, confessions, admissions, or documents that purport to be given by [him], whether oral, written or otherwise recorded, which the [G]overnment proposes to use as evidence against him." Docket No. 30.

Upon review of the Motion and after consultation with counsel, this Court scheduled a hearing on the Motion for January 31, 1996 and, after hearing evidence that day, continued the hearing until February 2, 1996.

Subsequently, the Court took additional evidence in connection with the Motion at a hearing held on March 20, 1996. During the hearings, both parties offered evidence and testimony with respect to the Motion. This Court thereafter took the matter under advisement.

## FACTUAL BACKGROUND

Late in the morning on February 24, 1995, Bad Hand met with Alexandra Asbury, a Special Agent with the Federal Bureau of Investigation (FBI) at the Rosebud Sioux Tribal Law Enforcement Services Building in Rosebud, South Dakota. The meeting had been prearranged and Bad Hand appeared voluntarily. Bad Hand agreed to talk to Asbury and did so for a little over an hour. During the interview, Bad Hand denied ever having sexual intercourse with T.K.[2] At the conclusion of the interview, Bad Hand inquired about what would happen next and he and Asbury talked about a polygraph examination. After explaining the polygraph examination and how it worked, Bad Hand agreed to submit to the same. Eventually, Bad Hand's polygraph examination was scheduled for 1:00 p.m. on June 8, 1995 at the Jackson County Courthouse in Kadoka, South Dakota.

On May 24, 1995 Bad Hand contacted Verdell Mesteth, an Oglala Sioux Tribal Attorney[3] requesting to meet with him to talk about accusations made by Bad Hand's mother-in-law that he had done "something" to his stepdaughter. Evid.Hrg.Tr. (Feb. 7, 1996) at 187. During his conversation with Mesteth, Bad Hand never made mention of the fact that he was scheduled to take a polygraph examination. Approximately eight or nine days later, Bad Hand contacted Mesteth again and briefly discussed the scheduled polygraph examination with him. Mesteth agreed to meet Bad Hand in Kadoka and

---

1. The Honorable Charles B. Kornmann, United States District Judge, presiding.

2. Bad hand does not point to any statements he made during his February 24, 1995 meeting with Asbury that he claims should be suppressed and this Court is unaware of any and will assume, for purposes of the suppression motion, that none exist.

3. Mesteth is not a member of the State Bar of South Dakota or licensed to practice law within the State. He has a license to practice as an attorney in Oglala Sioux Tribal Court and is authorized to carry the title of Oglala Sioux Tribal Attorney.

provide assistance to him during the polygraph examination.

On June 8, 1995, at the designated time, Lester Davis, a Special Agent with the FBI and a certified polygraph examiner, arrived in Kadoka and began setting up his instrument in a lower level room of the Jackson County Courthouse. Fifteen minutes or so later, Bad Hand, accompanied by his wife, Martha, identified himself and indicated that he was waiting for his tribal attorney to arrive. Davis then explained to Bad Hand and Martha how the polygraph worked and, after doing so, Bad Hand and Martha both left the room and went out to the lobby area. There, the two talked together for about twenty to twenty-five minutes. At approximately 1:45 p.m., Bad Hand approached Davis and agreed to take the polygraph examination. Prior to the commencement of the examination, Davis again explained what the polygraph consisted of and advised Bad Hand of his constitutional rights via a written interrogation and advice-of-rights form.[4] Bad Hand read the form and signed it. In addition, he signed a polygraph interview consent form which advised him that he could refuse to take the test, could stop the test at any time and could refuse to answer any individual questions.[5]

During the pre-test portion of the examination, Bad Hand admitted that he had "wrestled" with T.K. on one occasion but denied having any sexual contact with her. Following the administration of the acquaintance test[6] Davis again asked Bad Hand whether he ever had sexual intercourse with T.K. When Bad Hand responded affirmatively, Davis inquired further and Bad Hand confirmed that he did in fact have sexual intercourse with T.K. Upon hearing this, Davis proceeded to unhook Bad Hand from the polygraph instrument and talk to him about his admissions. While doing so, Bad Hand related that some time in December, 1993 and after Martha had gone to bed, "he entered the room where [T.K.] was sleeping, got up close to the bed where she was asleep and started to touch her breast area, place his hand between her legs down in the vagi-

4. This form, which was received into evidence at the January 31, 1996 evidentiary hearing as Plaintiff's Exhibit 1, reads as follows:

   *YOUR RIGHTS*
   Before we ask you any questions, you must understand your rights.
   You have the right to remain silent.
   Anything you say can be used against you in court.
   You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
   If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You will also have the right to stop answering at any time until you talk to a lawyer.
   *WAIVER OF RIGHTS*
   I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

5. The form, which was received into evidence as Plaintiff's Exhibit 2 at the January 31, 1996 evidentiary hearing states as follows:

   CONSENT TO INTERVIEW WITH POLYGRAPH

   Before we begin an examination by means of the polygraph in connection with sexual contact with [T.K.] you must understand your rights.
   *YOUR RIGHTS*
   You have the right to refuse to take the polygraph test.
   If you agree to take the polygraph test, you have the right to stop the test at any time. If you agree to take the polygraph test, you have the right to refuse to answer any individual questions.
   *WAIVER AND CONSENT*
   I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing. No threats or promises have been used against me to obtain my consent to the use of the polygraph. I understand that the examination room does not contain an observation device and that the examination will not be monitored or recorded.

6. In this test, the examinee is asked to write down a number and hide it from the examiner, then lie about the number that is chosen. The test is designed to demonstrate to the examinee that "the polygraph instrument can't tell the difference between a big lie or a little lie, it can only tell [the examiner] when somebody is not being truthful." Evid.Hrg.Tr. (Feb. 7, 1996) at 48. It is also designed to show the examinee "that the polygraph test does in fact work." Id. at 48–49.

nal area and shortly thereafter climbed on top of her and had sexual intercourse." Evid.Hrg.Tr. (Feb. 7, 1996) at 50. Subsequently, Davis wrote out a statement concerning the December, 1993 incident with T.K. which Bad Hand read, proofed and initialed. Bad Hand then penned the last paragraph of the statement, as Davis dictated it to him, and signed the same, acknowledging that the statement was true and correct to the best of his knowledge, that no threats or promises had been made to him, and that he was aware the statement could be used in court against him. The interview ended at 3:45 p.m. and Bad Hand left with Martha.[7] He was not arrested until the original indictment was returned in late September, 1995.

## DISCUSSION

### A. Custody.

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) held that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612. In determining whether an individual is in "custody", a court must "examine the extent of the physical or psychological restraints placed on the [individual]" from an objective standpoint in light of the totality of the circumstances present. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990); *see also, Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984); *United States v. Carter*, 884 F.2d 368, 370 (8th Cir.1989). The "ultimate inquiry, [however], is simply whether there [was] a 'formal arrest or re-straint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (*per curiam*)).

■ Here, after applying the relevant inquiry set forth in *Griffin* and other precedent handed down by the Supreme Court and the Eighth Circuit, and after considering the various factors outlined therein, this Court is unable to conclude that Bad Hand was in "custody" so as to trigger the protections of *Miranda*. Bad Hand's statements to Davis were made *after* he was advised of his *Miranda* rights and waived the same. Although the record does not indicate whether Bad Hand made any incriminating statements before being advised of his rights, even if he did, a reasonable man in his shoes would not have believed that he was under arrest at the time of his interview at the Jackson County Courthouse. *Beheler*, 463 U.S. at 1123–25, 103 S.Ct. at 3519–20; *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714; *see also, Minnesota v. Murphy*, 465 U.S. 420, 429–34, 104 S.Ct. 1136, 1143–46, 79 L.Ed.2d 409 (1984) (where probationer met with his probation officer at her office pursuant to her order and admitted, in response to her questioning, that he had committed a rape and murder some years ago, *Miranda* held inapplicable because probationer not "in custody"). Bad Hand appeared to understand the nature of his situation and was informed that he was not under arrest and free to leave. Although his freedom of movement was somewhat restricted because he was questioned in a closed room and hooked up to the polygraph instrument for a period of time, he was not handcuffed or otherwise restrained in a manner commonly associated with a formal arrest.[8] Bad Hand agreed to meet

---

7. Mesteth never made his appointment with Bad Hand at the Courthouse that day because of a court hearing in tribal court which lasted much longer than he expected.

8. The mere fact Bad Hand was attached to a polygraph machine during a portion of the questioning did not create an inherently coercive environment, tantamount to a formal arrest, which required *Miranda* warnings, given the events that led up to and transpired during his meeting with Davis at the Courthouse. *McDowell v. Leapley*, 984 F.2d 232, 234 (8th Cir.1993); *Jenner v. Smith*, 982 F.2d 329, 331–35 (8th Cir.), cert. denied, 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *see also, Leviston v. Black*, 843 F.2d 302, 304 (8th Cir.) (*Miranda* not applicable to interview with person incarcerated on unrelated charge where interview was initiated

with Davis and submit to a polygraph examination at the Courthouse, provided him with a written statement and responded to questions. No strong-arm tactics or deceptive stratagems were used to extract statements from Bad Hand and the interview/examination was relatively short in duration (two and one-half hours) and straightforward. Finally, Bad Hand was allowed to leave at the conclusion of the interview/examination and was not arrested until approximately three months later. Under these circumstances, Bad Hand was not in "custody" and as such, Davis was under no obligation to administer *Miranda* warnings to him.[9] *Id.; see also, United States v. Johnson*, 64 F.3d 1120, 1125–26 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996); *Jenner,* 982 F.2d at 334–35; *Griffin,* 922 F.2d at 1346–56.

### B. *Voluntariness.*

■ It is well-settled that a defendant's confession cannot be used at trial if it is involuntary. *See e.g., United States v. Washington,* 431 U.S. 181, 186–87, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977); *Michigan v. Tucker,* 417 U.S. 433, 440–41, 94 S.Ct. 2357, 2361–62, 41 L.Ed.2d 182 (1974); 18 U.S.C. § 3501; *see also; United States v. Alvarez–Sanchez,* 511 U.S. 350, ——, 114 S.Ct. 1599, 1604, 128 L.Ed.2d 319 (1994) ("because respondent's statement was made voluntarily, as the District Court found, ... nothing in § 3501 authorized its suppression.") *Brown v. Mississippi,* 297 U.S. 278, 279, 285, 56 S.Ct. 461, 462, 464–65, 80 L.Ed. 682 (1936) (the use of involuntary confessions violates due process). Under § 3501, "any confession of guilt ... or any self-incriminating state-

ment given orally or in writing," if voluntary, is admissible in evidence. § 3501(a), (e). Subsection (b) or the statute provides a non-exhaustive list of factors that a court should consider when determining the voluntariness of such a statement. None of these factors is necessarily determinative of voluntariness. Rather, the court must "take into consideration all of the circumstances surrounding the giving of the [statement] and consider the circumstances as a whole in its decision." § 3501(b); *United States v. Bordeaux,* 980 F.2d 534, 538–39 (8th Cir.1992); *United States v. Casal,* 915 F.2d 1225, 1228 (8th Cir.1990), *cert. denied,* 499 U.S. 941, 111 S.Ct. 1400, 113 L.Ed.2d 455 (1991).

■ While § 3501 provides the statutory guidance for determining the voluntariness of a confession, the constitutional test for voluntariness, as articulated by the Eighth Circuit, is whether "in light of the totality of the circumstances pressures exerted upon the suspect have overborne his will." *United States v. Jorgensen,* 871 F.2d 725, 729 (8th Cir.1989) (*citing Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–44, 10 L.Ed.2d 513 (1963)); *Winfrey v. Wyrick,* 836 F.2d 406, 410 (8th Cir.1987), *cert. denied,* 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988); *United States v. Rohrbach,* 813 F.2d 142, 144, *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987); *see also, United States v. Kilgore,* 58 F.3d 350, 353 (8th Cir. 1995); *United States v. Makes Room for Them,* 49 F.3d 410, 414–15 (8th Cir.1995); *Rachlin v. United States,* 723 F.2d 1373, 1377 (8th Cir.1983). Two factors must be considered in the voluntariness inquiry: the conduct of the law enforcement officers and the capacity of the suspect to resist pressure to

by defendant who voluntarily went to prisoner interview room under circumstances indicating that he was free to end the conversation and leave the room at any time), *cert. denied,* 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988); *Wilson v. Coon,* 808 F.2d 688, 689–90 (8th Cir. 1987) ("... the bare fact of physical restraint does not itself invoke the *Miranda* protections. The Supreme Court has recognized that a restraint on freedom of action does not *ipso facto* create a situation in which *Miranda* warnings are necessary.")

9. Nor can it be said that Bad Hand was "under arrest or other detention" at the time of his

interview/examination for purposes of 18 U.S.C. § 3501. It is undisputed that he had not been arrested on any federal charges when he met with and/or was questioned by Davis. Moreover, in view of the circumstances surrounding the interview/examination, including the site at which the same was conducted, this Court cannot conclude that Bad Hand was "detained" within the meaning § 3501. *See United States v. Valdez,* 16 F.3d 1324, 1332–33 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994); *United States v. Joseph,* 526 F.Supp. 504, 508–09 (E.D.Pa.1981).

confess. *Kilgore,* 58 F.3d at 353; *Makes Room for Them,* 49 F.3d at 415; *Jorgensen,* 871 F.2d at 729; *Rohrbach,* 813 F.2d at 144; *see also, Winfrey,* 836 F.2d at 410; *United States v. Wilson,* 787 F.2d 375, 386 (8th Cir.), *cert. denied,* 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). Although ultimately declining to decide the issue, the Eighth Circuit has suggested that "perhaps something more is required under § 3051(b) [sic] than is required by the Due Process Clause". *United States v. Bartlett,* 856 F.2d 1071, 1085 (8th Cir.1988). Nevertheless, in the context of determining the voluntariness of a statement, the Eighth Circuit has "considered [a] district court's findings in light of the § 3501 factors as well as the requirements of due process," stating that "the voluntariness inquiry is based on 18 U.S.C. § 3501 as well as due process." *Casal,* 915 F.2d at 1228, n. 3. It appears that a reviewing court must consider constitutional and well as statutory factors to determine the voluntariness of a defendant's statements.

The "overborne will/totality of circumstances" test was recently clarified and refined by the United States Supreme Court in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). There, the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment".[10] *Id.* at 167, 107 S.Ct. at 521–22. The Supreme Court emphasized that in the confession cases it had decided over the previous fifty years, the "crucial element" had been the presence of "police overreaching." *Id.* at 163 & n. 1, 107 S.Ct. at 519–20. The Court thus made it clear that a confession is only involuntary if law enforcement authorities use coercive activity to undermine the suspect's ability to exercise his free will. *Id.* at 167, 169–70, 107

S.Ct. at 521–22, 522–24. The Eighth Circuit has interpreted *Connelly* to mean that the "personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the [Government].'" *Sidebottom v. Delo,* 46 F.3d 744, 758 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 144, 133 L.Ed.2d 90 (1995) (*quoting Rohrbach,* 813 F.2d at 144); *see also, Jenner v. Smith,* 982 F.2d at 333–34.

■ The burden of proof on the issue of voluntariness is one of a preponderance of the evidence. *Connelly,* 479 U.S. at 168–69, 107 S.Ct. at 522–23; *United States v. Wright,* 706 F.2d 828, 830 (8th Cir.1983). To be admissible, the Government must establish by a greater weight of the evidence that a defendant's confession was voluntarily made. In other words, it must prove that the defendant's confession was more likely than not voluntarily given. *See Manual of Modern Federal Jury Instructions For The District Courts of The Eighth Circuit, § 3.04 at 37* (1995 ed.); 3 E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice and Instructions (Civil), § 72.01 at 31–32,* (4th ed. 1987 & Supp.1995).

■ Although not altogether clear, it appears that one of Bad Hand's arguments is that his incriminatory statements were involuntary because he is of a borderline intelligence level and is therefore peculiarly susceptible to having his will overborne.[11]

Yet, in cases the same or similar to the one at hand, the Eighth Circuit and other courts of appeal have held the confessions were voluntary. *Makes Room For Them,* 49 F.3d at 412–15 (defendant with average or lower than average intelligence and an eighth grade education); *Chischilly,* 30 F.3d at 1147–48, 1151 (defendant with a verbal IQ of

---

10. Although *Connelly* arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, it has been extended to involuntary confession claims arising under the Fifth Amendment as well. *See e.g., United States v. Newman,* 889 F.2d 88 (6th Cir.1989), *cert. denied,* 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 748 (1990); *see also, United States v. Chischilly,* 30 F.3d 1144, 1151, n. 5 (9th Cir.1994), *cert. de-*

*nied,* —— U.S. ——, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995).

11. According to the evaluating psychologist, Frank Dame, Bad Hand had a verbal IQ of 80, a performance IQ of 76 and a full-scale IQ of 77, placing him in the "borderline" range of intellectual ability. *See* Defendant's Exhibit A (which was received into evidence during the February 2, 1996 Evidentiary Hearing) at 6.

approximately 62 and a functional level of a five or six-year-old child); *United States v. Frank,* 956 F.2d 872, 875–78 (9th Cir.1991) (defendant with "low average" intelligence who suffered from relatively mild depression), *cert. denied,* 506 U.S. 932, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992); *Derrick v. Peterson,* 924 F.2d 813, 815–19 (9th Cir.1990) (defendant with an IQ of between 62 and 74 in the borderline range of mental retardation), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991); *United States v. Macklin,* 900 F.2d 948, 950–53 (6th Cir.) (one defendant with an IQ of 59 was not able to read written instructions and had very severely limited capacity to understand verbal instructions, and another defendant with an IQ of 70 who was "just ever so slightly better off than mildly retarded"), *cert. denied,* 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990); *Moore v. Dugger,* 856 F.2d 129, 131–34 (11th Cir.1988) (defendant with an IQ of 62, who functioned at an intellectual level of an eleven-year-old and was classified as educable mentally handicapped); *Dunkins v. Thigpen,* 854 F.2d 394, 398–400 (11th. Cir. 1988) (defendant who could not read and function at the high, mild range of mental retardation), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *Winfrey v. Wyrick,* 836 F.2d at 407–12 (defendant with an IQ of 85 to 90, the mental age of about a fourteen or fifteen-year-old, with a 5th or 6th grade level of academic achievement); *Vance v. Bordenkircher,* 692 F.2d 978, 979–82 (4th Cir.1982) (defendant with an IQ of 62 and no lawyer present), *cert. denied,* 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 114 (1983); *Hall v. Wolff,* 539 F.2d 1146, 1149–52 (8th Cir.1976) (defendant with a low order of intelligence); *Coney v. Wyrick,* 532 F.2d 94, 95–98 (8th Cir.1976); (defendant with "subnormal intelligence"); *see also, United States v. Officer,* No. 94–10032–01, 1994 WL 723966 at **2–3 (D.Kan., Dec. 14, 1994) (defendant who was mildly mentally retarded and suffered from attention deficit disorder); *Fair-*

*child v. Lockhart,* 744 F.Supp. 1429, 1431, 1434–95 (E.D.Ark.1989) (defendant with an IQ of 63 and "mentally retarded"), *aff'd,* 900 F.2d 1292 (8th Cir.), *cert. denied,* 497 U.S. 1052, 111 S.Ct. 21, 111 L.Ed.2d 834 (1990); *see generally,* Annot., *Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession,* 8 A.L.R.4th 16 (1981 & Supp.1995) (collecting federal and state cases).

Bad Hand also seemingly claims that his admissions were involuntary due to a memory loss caused by a closed head injury suffered during an automobile accident in 1976. Dame testified that Bad Hand suffers from significant memory impairment and is not likely to recall things said to or asked of him twenty-five minutes earlier. Dame, however, found it unusual that a person with Bad Hand's IQ and memory problems would be able to attend college for two years. Dame also admitted that Bad Hand's memory loss "appears more to be oriented toward irrelevant, non-pertinent, incidental material", Evid.Hrg.Tr. (Mar. 26, 1996) at 21, and that statements he made about having sex with someone one-half to two years earlier, were likely to be accurate, *id.* at 20.

More importantly, Bad Hand has failed to affirmatively establish that his memory was impaired or that he suffered from a memory lapse during his interview/examination with Davis.[12] Rather, it appears, based on the admissions Bad Hand made and the written statements he signed, that his memory was intact when he confessed to sexually abusing T.K.

This Court, therefore, does not believe that Bad Hand had a memory impairment that was severe enough to cause him to "forget" the rights he had been advised of or the explanation of the polygraph examination Davis had given to him. Indeed, Bad Hand's request that the polygraph examination be delayed until Mesteth arrived undercuts any

---

12. No credible evidence was offered that Bad Hand was forgetful or had a hard time remembering things *immediately before, after or during* his meeting with Davis at the Courthouse. Nor did Dame offer an opinion, to a reasonable degree of certainty within his chosen field, as to whether Bad Hand was suffering from mental

impairment at the time of his review/examination. Finally, even if Bad Hand has a generalized memory loss problem, there has been no particularized showing that he was experiencing a memory breakdown when he confessed to Davis. In fact, the record indicates that the contrary is true.

claim that he did not know or could not remember he had the right to have counsel with him during the interview/examination and/or that he could exercise this right at any time.

Even assuming Bad Hand, because of his IQ and asserted memory impairment, had a somewhat diminished capacity to resist pressure and avoid making inculpatory statements, nonetheless, his confession is admissible under *Connelly* and its progeny because of the absence of coercive activity and/or overreaching by law enforcement authorities. *See McCray v. State*, 591 So.2d 108, 110–12 (Ala.Cr.App.1991) (defendant with an IQ of 65 who suffered from chronic alcohol abuse resulting in significant memory impairment, dementia and organic brain syndrome); *State v. Jenkins*, 300 N.C. 578, 581, 583–85, 268 S.E.2d 458, 461–63 (1980) (defendant with an IQ of less than 60 who was mildly mentally retarded and had a markedly impaired memory); *Britt v. Commonwealth*, 512 S.W.2d 496, 499–500 (Ky.1974) (defendant who was a confirmed alcoholic and had memory gaps); *see also; State v. Jenner*, 451 N.W.2d 710, 717–20 (S.D.1990).

After reviewing the record and assessing the credibility of the witnesses who testified, this Court is unable to find that the requisite coercive or overreaching conduct was present on June 8, 1995 so as to make Bad Hand's confession involuntary. No threats or promises were made to Bad Hand and no undue influence or pressure exerted on him. The duration, tone and overall atmosphere of the interview/examination were not hostile or coercive. Although Martha maintains that Davis was impatient and after about five minutes became upset and said, "We don't honor tribal attorneys," and "intimidated" Bad Hand into taking a polygraph examination, Evid.Hrg.Tr. (Feb. 7, 1996) at 94–96, 112–114, the evidence of record and her overall lack of credibility belie these assertions.[13] Davis never testified whether he was aware of Bad Hand's intellectual or memory impairments, but even if he did, there was nothing in the record to show that he "exploited these weaknesses with coercive tactics." *See Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir.) (*quoting Connelly*, 479 U.S. at 165, 107 S.Ct. at 520–21)), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988)). Finally, Davis' conduct did not resemble or even approach the coercive police conduct present in *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) or any of the involuntary confession cases cited in *Connelly*. *See* 479 U.S. at 164–65, 169–70, 107 S.Ct. at 520–21, 522–24.

The fact that Bad Hand's confession came immediately following the pre-test portion of the polygraph examination, without renewed *Miranda* warnings, is of little, if any significance because the circumstances present, when considered *in toto*, clearly demonstrate that the confession was made voluntarily. *Wyrick v. Fields*, 459 U.S. 42, 47–49, 103 S.Ct. 394, 396–397, 74 L.Ed.2d 214 (1982), *on remand*, 706 F.2d 879, 880–82 (8th Cir.), *cert. denied*, 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); *McDowell*, 984 F.2d at 234; *Jenner*, 982 F.2d at 333–34; *Vassar v. Solem*, 763 F.2d 975, 977–78 (8th Cir.1985); *United States v. Iron Thunder*, 714 F.2d 765, 771–72 (8th Cir.1983); *United States v. Jackson*, 712 F.2d 1283, 1285–86 (8th Cir.1983); *United States v. Eagle Elk*, 711 F.2d 80, 81–83 (8th Cir.1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *see also, Jenner*, 451 N.W.2d at 717–20.

Accordingly, the admissions made by Bad Hand to Davis were voluntary and not the product of coercive interrogation or overreaching on the part of Davis. *Id.; Makes Room For Them*, 49 F.3d at 415; *Sidebot-*

---

**13.** This Court did not find Martha's testimony to be overly credible. For example, Martha was "positive" Davis told her that he had come all the way from Rapid City to do the polygraph examination. Evid.Hrg.Tr. (Feb. 7, 1996) at 115. Davis, however, testified that prior to June 8, 1995, he had been in Rochester, Minnesota and Sioux Falls, South Dakota and was on his way back to Rapid City (his duty station) and that the polygraph was set up to accommodate his return travel plans. *Id.* at 25, 28. Moreover, the Court found it difficult, if not impossible, to believe Martha's testimony that Davis, at the conclusion of the interview/examination, told Bad Hand that he (Bad Hand) had passed the polygraph and that his name was going to be cleared. *See id.* at 119–20. These statements and others severely detracted from Martha's credibility and the overall reliability and trustworthiness of her testimony.

*tom,* 46 F.3d at 757–58; *Jorgensen,* 871 F.2d at 729–30; *Winfrey,* 836 F.2d at 410–12; *Rohrbach,* 813 F.2d at 144. Bad Hand was read his rights, waived them and voluntarily confessed. Because Davis took no action that could objectively be considered as coercion or overstepping his bounds, there is nothing to refute the voluntariness of Bad Hand's statements. The Government has thus established, by a preponderance of the evidence, that Bad Hand's statements satisfied the voluntariness requirements of both § 3501 and the Constitution.

## C. *Waiver.*

Having determined that Bad Hand's statements to Davis were voluntary, this Court must next proceed to determine whether the waiver of his *Miranda* rights was valid based on "the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused," *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979) (*quoting Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), when measured against applicable precedent.

The Supreme Court in *Miranda* held that defendant's statements, obtained during custodial interrogation, would be admissible only if the Government meets "its heavy burden" of demonstrating "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel", 384 U.S. at 475, 86 S.Ct. at 1628. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, interrogation must cease," for he has thus "shown that he intends to exercise his Fifth Amendment privilege . . . ." *Id.* at 473–74, 86 S.Ct. at 1628. `

The tone and language of the *Miranda* opinion seemed to indicate that the Supreme Court would be receptive to nothing short of an express waiver of the rights involved. *Id.* at 475–76, 86 S.Ct. at 1628–29. Although many lower courts took the position that the *Miranda* waiver of rights did not have to be explicit, *see, e.g., United States v. Boston,* 508 F.2d 1171 (2d Cir.1974), *cert. denied,* 421

U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975), this issue was not firmly resolved until the Supreme Court's decision in *Butler.* There, defendant was given his *Miranda* rights orally at the time of arrest and later at the FBI office he was read an Advice of Rights form which he said he understood, after which he said he would talk to FBI agents but would not sign the waiver on the form. 441 U.S. at 370–71, 99 S.Ct. at 1755–56. The North Carolina Supreme Court excluded defendant's incriminatory statement on the ground that a waiver of *Miranda* rights "will not be recognized unless such waiver is 'specifically made' after the *Miranda* warnings have been given." *Id.* at 372, 99 S.Ct. at 1757. The Supreme Court disagreed, holding that a defendant's failure to explicitly waive his right to remain silent or his right to counsel, after being advised of his *Miranda* warnings, did not *per se* require exclusion of defendant's statement if a waiver could be found from defendant's actions and conduct and the surrounding circumstances. *Id.* at 373–76, 99 S.Ct. at 1757–59.

The inquiry into whether a waiver is valid or has been coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986) (*citing Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981)):

> First, the relinquishment of the rights must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (*quoting Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979)); *see also, Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 856–57, 93 L.Ed.2d 954 (1987); *Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1757–59. In view of the

Supreme Court's teachings in *Burbine*, this Court concludes that it is obligated to bifurcate the *Miranda* waiver analysis into a determination of whether the waiver (1) was "voluntary" and (2) was "knowing and intelligent". *See e.g., Powell v. Bowersox*, 895 F.Supp. 1298, 1310 (E.D.Mo.1995) (valid waiver must not only be voluntary, but must be intelligently made). Having previously decided the voluntariness issue, the Court now turns its attention to whether Bad Hand's waiver was a "knowing" and "intelligent one."

Bad Hand was advised of his *Miranda* rights [14] and waived these rights in writing. The written waiver itself constitutes strong evidence that Bad Hand had a clear understanding of his rights and intended to and did give up the same. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757 ("an express written ... statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver ..."). In addition, Bad Hand's educational background, his attempts to secure counsel for the interview/examination and his request to delay the start of the same to allow counsel time to arrive weighs heavily in favor of a valid waiver. Based on the entirety of the record, there can be little doubt that the Government has met its burden of proving, by a preponderance of the evidence, that Bad Hand knowingly and intelligently waived his *Miranda* rights before being questioned and making his inculpatory remarks to Davis on June 8, 1995.

The fact that Bad Hand's admissions were made in response to questions asked of him during a polygraph examination did not serve to vitiate Bad Hand's waiver or the validity of the same. By agreeing to submit to the polygraph examination, Bad Hand consented to questioning and waived not only his right to be free from contact with

law enforcement authorities in the absence of an attorney, but also his right to be free of interrogation about the crime he was suspected of committing. *See Fields*, 459 U.S. at 47, 103 S.Ct. at 396, *on remand*, 706 F.2d at 881–82; *Eagle Elk*, 711 F.2d at 82–83; *see also, Jenner*, 451 N.W.2d at 717. Regardless of what Bad Hand and Mesteth's anticipations were regarding the polygraph examination and the questions Bad Hand would be asked, "it would have been unreasonable" for [Bad Hand and/or Mesteth] to assume that [Bad Hand] would not be informed of the polygraph readings and asked to explain any unfavorable result[s]". *Fields*, 459 U.S. at 47, 103 S.Ct. at 396, *on remand*, 706 F.2d at 881. "Moreover, [Bad Hand] had been informed that he could stop the questioning at any time, and could request at any time that his lawyer join him." Merely disconnecting the polygraph equipment could not remove this knowledge from [Bad Hand's] mind even assuming some memory impairment.[15] *Id.; see also, Vassar*, 763 F.2d at 978; *Eagle Elk*, 711 F.2d at 83. It is plain from the record that Bad Hand fully understood and expressly waived his rights prior to the interview/examination. As such, he voluntarily, intelligently, knowingly and intentionally relinquished both his Fifth and Sixth Amendment rights during the interview/examination. Therefore, on the basis of the Supreme Court's pronouncements in *Fields*, and Eighth Circuit decisions interpreting it [16], this Court is firmly convinced that Bad Hand's inculpatory statements are admissible at trial.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing and in accordance with 28 U.S.C. § 636(b)(1), this Court concludes that Bad Hand's statements were made voluntarily and during the course of

---

**14.** Davis orally read the Advice of Rights form to Bad Hand and furnished him a copy of the form which Bad Hand read.

**15.** This Court did not place much stock in Bad Hand's memory impairment claim in light of Dame's testimony on cross examination during the March 20, 1996 evidentiary hearing. Nor did the Court believe, in spite of the testimony offered by Dame, that Bad Hand forgot or was

unable to remember anything that he read or was advised of at the beginning of his interview/examination with Davis.

**16.** *See Vassar*, 763 F.2d at 977–78; *Iron Thunder*, 714 F.2d at 771–72; *Eagle Elk*, 711 F.2d at 81–83; *Fields*, 706 F.2d at 880–82; *see also, McDowell*, 984 F.2d at 234; *Jenner*, 982 F.2d at 330–34; *Jackson*, 712 F.2d at 1287.

non-custodial interrogation (so that *Miranda* warnings were not required) and/or were made after he knowingly and intelligently waived his rights. Accordingly, the Court recommends that Bad Hand's Motion to Suppress, Docket No. 30, be denied in all respects.

Dated this 9th day of May, 1996, at Pierre, South Dakota.

## NOTICE

Failure to file written objections to the within and foregoing Findings of Fact, Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Findings, Report and Recommendations before the assigned United States District Judge. *See* 28 U.S.C. § 636(b)(1)(B).