**UNITED STATES of America,**
**Plaintiff,**

v.

**Desmond ROUSE, Jesse Rouse, Garfield Feather, and Russell Hubbeling, Defendants.**

**No. CR 94–40015.**

United States District Court,
D. South Dakota,
Southern Division.

Feb. 10, 2004.

Dennis Holmes, Michelle Tapken, Jan Holmgren, United States Attorney's Office, Sioux Falls, SD, for Plaintiff.

John M. Wilka, Wilka Law Firm, Sioux Falls, SD, for Defendant, Desmond Rouse.

Steven R. Binger, Binger Law Office, Sioux Falls, SD, for Defendant, Jessie Rouse.

David O. Carter, Attorney at Law, Sioux Falls, SD, for Defendant, Garfield Feather.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Pending before the Court is a Motion for New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Doc. 428.) The motion was filed by defendants Desmond Rouse, Jesse Rouse, Garfield Feather and Russell Hubbeling. For the following reasons, the motion will be denied.

### BACKGROUND

In August of 1994, defendants were convicted by a jury on charges of aggravated sexual abuse involving five young girls in their extended family aged 20 month to seven years in violation of 18 U.S.C. § 2241(c). After the Court imposed sentence, the defendants appealed. A divided Eighth Circuit panel initially reversed the defendants' convictions, *United States v. Rouse*, 100 F.3d 560 (8th Cir.1996), but after the entire Eighth Circuit granted *en banc* review and vacated the panel opinion, *United States v. Rouse*, 107 F.3d 557 (8th Cir.1997), the panel, on rehearing, issued a new opinion affirming the convictions and *en banc* review was dismissed. *United States v. Rouse*, 111 F.3d 561 (8th Cir.), *cert. denied*, 522 U.S. 905, 118 S.Ct. 261, 139 L.Ed.2d 188 (1997). On May 3, 2002,

another panel of the Eighth Circuit affirmed this Court's denial of defendant Hubbeling's 28 U.S.C. § 2255 motion to vacate his sentence. *Hubbeling v. United States,* 288 F.3d 363 (8th Cir.2002). The facts are fully set forth in the three opinions issued by the Eighth Circuit, and they will not be repeated here except as necessary to resolve this motion.

On June 11, 1999, the defendants filed this Motion for New Trial arguing that recantations by witnesses T.R., D.R., R.R., L.R. and J.R. constitute newly discovered evidence entitling the defendants to a new trial.[1] In affidavits submitted with the motion, R.R. and T.R. deny being molested by the defendants and D.R. attests that he made up lies about what happened. An Affidavit of Ralph Underwager, a clinical psychologist who testified on behalf of the defendants at trial, was submitted with the motion. In his Affidavit, Dr. Underwager indicates that he interviewed T.R., D.R., R.R., L.R. and J.R. on January 30, 1999. He attests that T.R., D.R., J.R. and L.R. told him that the abuse testified to at the trial never happened. Dr. Underwager said he believes the recantations are credible.

The Court viewed Dr. Underwager's videotaped interviews of the children. In addition to the five interviews that occurred in 1999, the videotapes contain interviews of D.R. and T.R. that occurred in 1996. During the interviews, Dr. Underwager told the children that he was there to help the children get the defendants get out of prison and he talked about the length of the prison sentences imposed. R.R. did not recant her trial testimony during her interview with Dr. Underwager. In fact, R.R. responded affirmatively when Dr. Underwager asked if Jesse did things to her that were not right.

The Court heard oral argument on the Motion for New Trial on December 13, 2000. After hearing argument and reviewing the entire record, the Court granted the defendants' request for an evidentiary hearing. Several continuances were granted to allow defense counsel to prepare for the hearing. The evidentiary hearing was held for four days in September 2001.

At the evidentiary hearing, the defense presented testimony of Maggie Bruck, an associate professor in child psychiatry at Johns Hopkins University. Dr. Bruck has researched literature regarding recantation of child witnesses. She testified that published studies show the rate of recantation varies from 3% to 27% of children who have reported sexual abuse. Dr. Bruck was unaware of any scientific studies showing that recantations come about due to social and family pressure. She did not interview the child witnesses and her testimony was not specific to the facts of this case.

The defense also presented testimony from Kathleen Honomichl, a woman who worked for Tribal Social Services from June of 1995 through June of 1997. Ms. Honomichl is not a certified social worker. She has lived all of her life in the same community as the Rouse family. Her job included working with L.R., J.R., T.R and D.R. (not R.R.) to get them back into their homes. While Ms. Honomichl was working with the children, they were placed at Children's Home Society in Sioux Falls and they had weekend visits with their mothers and sometimes with their grandmother. On direct examination, Ms. Honomichl said she found the children's allegations of sexual abuse unbelievable from the first time she read the reports in their

---

1. Each of these witnesses, with the exception of D.R., were victims. The other victim was F.R. who was 20 months old at the time of the abuse and did not testify at trial.

files. Her beliefs were reinforced when she received a report in February or March of 1996 indicating that J.R. stated in group therapy that the abuse had not occurred. Later, T.R., D.R. and R.R. were allowed for the first time to go home to the reservation for a weekend visit. During that weekend, T.R., D.R. and R.R. stopped in Ms. Honomichl's office on the reservation. T.R. said that her uncles did not abuse her. D.R. and R.R. listened to T.R. but said nothing.

L.R., J.R., T.R., D.R. and R.R. testified at the evidentiary hearing that the sexual abuse did not happen. They said that they lied about the abuse because they were pressured to do so and they thought they would be allowed to go home if they said that the abuse happened.

William Van Roe, the FBI case agent who investigated this case, testified that the children never recanted their allegations of sexual abuse. The prosecutor testified that the children never denied that their uncles sexually abused them. Eva Cheney, an attorney admitted to practice before this Court and the guardian ad litem for the children, testified that none of them recanted in her presence. Teryl Cadwell, the probation officer who conducted interviews to prepare the presentence investigation report, said that she interviewed some of the victims and none of them said the abuse had not occurred. Dr. Michaleen Muhovich (R.R.'s counselor from 1994 to 1997) and counselors at the Children's Home Society, Karla Harmon and Mary Weber, testified that the children continued to describe the acts of sexual abuse to them after the trial and before the children were returned home. The counselors and Kathleen Honomichl also said that the children's mothers never believed the abuse had occurred and neither did other family members. Julie Brown, the foster mother for J.R. and L.R.

from August of 1996 to August of 1997, testified that both girls were afraid of their uncles and did not recant when they were staying with her.

One of the government's witnesses, Cheri Freidel, was a school counselor in Wagner, South Dakota who became acquainted with J.R., L.R. and R.R. in the fall of 1999, after the children were returned home. J.R. approached Ms. Freidel on December 6, 1999. J.R. told Ms. Freidel that she was afraid for Christmas because her uncles were coming home. J.R. explained to Ms. Freidel that her uncle had touched her private parts and she was afraid he would be coming home and be mad at her for telling. J.R. also told Ms. Freidel that during the summer of 1999 she and her sister had to tell a social worker that someone made up the stories about her uncles so that they could come home from prison. Before this meeting with J.R., Ms. Freidel was not even aware of the case or the allegations of sexual abuse. She contacted the FBI to find out if the uncles referred to by J.R. were coming home for Christmas. Ms. Freidel then met with J.R. to inform her that the uncles would not be coming home. During this second meeting, J.R. told Ms. Freidel that both her own mother and R.R. had told J.R. to lie to the social worker in the summer of 1999.

Dr. David Corwin, the medical director of Primary Children's Center for Safe and Healthy Families at the University of Utah School of Medicine, testified as an expert witness on behalf of the government. He is familiar with literature on child witness recantations and has clinical experience with child sexual abuse cases, including cases involving recantations. Dr. Corwin was asked hypothetical questions about sexually abused children being returned to non-supportive families where they may have been pressured to change

their testimony, where they have had some contact with the abuser via telephone or letters, where they were made aware of lengthy prison sentences given the defendants, and where they lacked other outside support such as counseling or attending school. According to Dr. Corwin, the literature on child witness recantation indicates that all of these factors would make a child more likely to recant sexual abuse allegations.

While the Court was considering the evidence submitted by the parties at the evidentiary hearing, the defendants filed an "Addendum" to their motion in which they asked the Court to consider, as evidence in support of the Motion for New Trial, the results of a polygraph examination of one of the child witnesses. (Doc. 530.) The Court advised the parties that it would hold a *Daubert* hearing both for the Court to determine the effect of the polygraph test on the motion for new trial, and to consider if the polygraph test would be admissible at trial if a new trial were granted. The Court indicated that consideration of the polygraph evidence for purposes of ruling on the motion for new trial would not mean that the Court would, without further consideration, admit the evidence at trial if a new trial were granted.

A *Daubert* hearing on the reliability of the polygraph evidence was scheduled to commence on March 14, 2003. Prior to the *Daubert* hearing, the government discovered that another child witness, one of the victims, had been polygraphed. Although the defendants did not intend to ask the Court to consider this second polygraph for the Court's consideration, the government requested time to review the additional polygraph evidence and to submit it to its expert for his review. The *Daubert* hearing was continued to April 7, 2003.

On April 7, 2003, the Court held the *Daubert* hearing and heard testimony from Loren Pankratz, the examiner who conducted one polygraph test of child witness D.R. and two tests of child victim-witness T.R. in September of 1999. Mr. Pankratz explained the protocol he followed. He opined that D.R.'s responses to the questions posed during the polygraph test, responses denying that sexual abuse had occurred, were truthful. T.R.'s responses to questions about the abuse were deemed inconclusive, neither truthful nor deceptive, by Mr. Pankratz. It is D.R.'s polygraph examination that the defendants want the Court to consider for purposes of this motion.

The government called Phillip Gadd as its expert witness to testify about the reliability of the polygraph examinations. Mr. Gadd is a special agent with the FBI and he is a federally certified polygraph examiner. He works in the FBI's Polygraph Unit. His duties include supervising 17 FBI polygraph field examiners. Mr. Gadd testified that the fundamental theory behind polygraph testing is that the subject will fear his or her deception will be detected, and the fear will cause physiological changes that will be recorded. Mr. Pankratz and Mr. Gadd agree that a polygraph test does not measure deception directly. Rather, it measures physiological responses that are believed to be stronger during acts of deception than at other times. As Mr. Gadd stated, it tests the subject's perception of the truth but not the truth itself. Mr. Gadd defined "reliability" of polygraphs as the degree to which a test yields the same results when persons are re-polygraphed by different examiners or the polygraph charts are re-scored by another examiner. "Validity" means accuracy or ability to detect deception and truthfulness. (Doc. 538, Declaration of Phillip M. Gadd at ¶ 8.) Mr. Gadd

testified that it is impossible to determine the measure of polygraph reliability. In his Declaration, he stated:

> The potential rate of error in criminal applications for polygraph is unknown. Errors occur when conducting polygraph examinations in criminal investigations. Errors can be "false positives," which means a truthful person is determined to be deceptive, and "false negatives," which means a deceptive person is considered to have passed the test. However, the frequency of false positive and false negative results is unknown. Because scientists are unable to conduct field studies under ideal (laboratory) conditions, and the absolute truth is not always available to validate the results of polygraph examinations in actual criminal cases, known error rates remain elusive.

(*Id.* at ¶ 10.)

Mr. Gadd reviewed the videotape of D.R.'s polygraph. He had a number of concerns about its validity. He opined that the questions were not formulated in accord with standards taught by polygraph schools, and that the test format was flawed in part because Mr. Pankratz did not note D.R.'s excessive movements on the polygraph chart. The reliability of the polygraph examinations is considered below in the Court's legal analysis.

## DISCUSSION

### A. *Polygraph Examinations*

■ In *Anderson v. United States,* 788 F.2d 517, 519 n. 1 (8th Cir.1986), the Eighth Circuit upheld its rule that polygraph examination results should not be admitted absent stipulation. If that rule still applies today, the polygraph evidence in this case would be inadmissible because the government objects to it. However, subsequent to *Anderson,* the United States Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (provides guidance to the federal courts on admissibility of expert evidence, emphasizing that the Rule 702 inquiry is flexible). The Fifth, Ninth and Tenth Circuits have held that *Daubert* overruled the per se rule excluding polygraph evidence. *See United States v. Cordoba,* 104 F.3d 225, 228 (9th Cir.1997); *United States v. Call,* 129 F.3d 1402, 1404 (10th Cir.1997); *United States v. Posado,* 57 F.3d 428, 431–34 (5th Cir.1995). The Eighth Circuit has not explicitly overruled the per se exclusion of polygraphs, but cases imply that unstipulated polygraph evidence might be admissible if it meets *Daubert* standards even in the absence of a stipulation. *See, e.g., United States v. Greatwalker,* 356 F.3d 908, 912 (8th Cir.2004)(per curiam)(because the defendant never established or argued the results of lie detector tests taken by witnesses were reliable under *Daubert,* the polygraph results were inadmissible); *United States v. Jordan,* 150 F.3d 895 (8th Cir.1998) (reviewing district court's decision to exclude evidence pursuant to *Daubert* and Rule 403 and finding court did not abuse discretion by excluding polygraph test results as more prejudicial than probative); *United States v. Williams,* 95 F.3d 723 (8th Cir.1996) (district court applied *Daubert* standard to polygraph evidence after government moved to exclude it; Eighth Circuit held there was not enough evidence to support a *Daubert* determination but upheld the district court's exclusion of the evidence under Rule 403 as more prejudicial than probative). The Court believes that polygraph evidence is no longer per se inadmissible in the Eighth Circuit and that polygraph evidence could be admitted in the absence of a stipulation from the government, and even over its objection, if the evidence meets *Daubert* standards.

The government urges the Court to exclude Mr. Pankratz's testimony and the polygraph evidence for several reasons. The government argues that, while the polygraph has scientific underpinnings, it is an art and not a science. Indicating that the polygraph may be useful as an investigative aid, the government contends that is it not reliable enough to be used as evidence in court proceedings.

■ To be admissible, expert scientific testimony must meet the standards of Federal Rule of Evidence 702. The Supreme Court has defined the applicable standards in *Daubert*. *See Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (reviewing a decision granting summary judgment and stating that courts must exercise "gatekeeping" function to ensure that all expert testimony is reliable and relevant, using the general principles presented in *Daubert* ); *Jaurequi v. Carter Manufacturing Co., Inc.,* 173 F.3d 1076, 1082 (8th Cir.1999) (applying the principles of *Kumho Tire Co.*). The Court may look to *Daubert* for guidance as to whether expert testimony should be admitted or excluded and should rely on the *Daubert* reliability factors only to the extent that they are relevant to the analysis before the Court. *Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167; *Jaurequi,* 173 F.3d at 1083. The Court "must customize its inquiry to fit the facts of each particular case[.]" *Jaurequi* at 1083.

In response to *Daubert* and the many cases applying *Daubert,* including *Kumho,* Federal Rule of Evidence 702 was amended effective December 1, 2000, by adding three requirements for the admissibility of expert testimony. As amended, Rule 702 now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Advisory Committee Notes to the 2000 Amendment indicate that the "reliable application" requirement is a significant addition to *Daubert.* The *Daubert* Court stated, "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate," 509 U.S. at 595, 113 S.Ct. 2786, but the amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. *See* Advisory Committee Notes to the 2000 Amendment.

■ In analyzing Mr. Pankratz's proposed testimony regarding the polygraph examinations, the Court considered the *Daubert* reliability factors: "(1) whether the concept has been tested, (2) whether the concept has been subject to peer review, (3) what the known rate of error is, and (4) whether the concept is generally accepted by the community." *Pestel v. Vermeer Mfg. Co.,* 64 F.3d 382, 384 (8th Cir.1995). Both experts indicated that the polygraph has undergone testing in both laboratory and field settings, and that it has been subject to peer review and publication. As for the third *Daubert* factor, the known or potential rate of error, Mr. Pankratz believes the examination can have a 10 to 15% error rate. Mr. Gadd testified that some studies indicate a 40 to 90% error rate. The fourth *Daubert* factor cuts against considering the results of

D.R.'s polygraph examination because the testimony at the *Daubert* hearing, the literature submitted by the parties and legal research reveal that the polygraph has not been generally accepted by the community for use in the courtroom to determine the truthfulness of witness testimony. *See, e.g., Ortega v. United States*, 270 F.3d 540, 548 (8th Cir.2001) (reversing sentence and remanding for resentencing when district court relied on results of polygraph examination for an obstruction of justice enhancement, noting that "most courts of appeal that have considered the issue of admissibility of polygraph evidence at sentencing have upheld refusals to admit such evidence").

Recognizing that the *Daubert* factors are not necessarily dispositive of the issue of reliability, the Court carefully evaluated the proposed polygraph evidence. The parties in this case agree that a valid polygraph examination requires the proper administration of an accepted testing procedure and scoring system. Mr. Pankratz testified that he used the Zone Comparison Test developed by Backster for D.R.'s polygraph examination. He asked relevant questions and "probable lie" comparison questions. Relevant questions deal with the issue of concern in the case; in this case, the issue is whether sexual abuse occurred. "Probable lie" comparison questions are designed to get a "no" response that is a lie, and that physiological response is compared to the physiological response to the relevant question. Mr. Pankratz asked D.R. the following relevant questions:

1. Did you see your uncles do something sexual to your sisters?

2. Did you see your uncles do something sexual to [T.R.]?

3. Did your uncle Desmond put you in the attic like you told the police?

The first chart represented the first time Mr. Pankratz asked D.R. the three questions listed above. He asked the three questions three different times and thus had three charts. Mr. Pankratz marked on the chart when the response occurred. The response to each question was "no." Mr. Pankratz scored each question with a plus or minus 3 based on the physiological responses that were measured. A "plus" means a truthful response and a "minus" means a deceptive response. Mr. Pankratz gave D.R. a cumulative score of +18 on the three charts, which he says indicates the responses were truthful. A cumulative score of +7 or +8 is needed for truthfulness, and the best possible cumulative score for three charts is +27. The results of D.R.'s examination were not reviewed or evaluated by anyone other than Mr. Pankratz.

Mr. Gadd testified that Mr. Pankratz's test did not meet the standards of the Backster test or any other accepted polygraph testing procedure. According to Mr. Gadd, the questions asked of D.R. should have been more narrow and specific. Mr. Gadd said that the reference to "something sexual" is too general. In addition, Mr. Pankratz should have done separate tests on the sexual abuse and on the attic rather than mixing those two issues. Further, each of the uncles and each of the sisters should have been identified and addressed in separate tests. Mr. Gadd noticed that D.R. moved excessively during the test and he said that such movements are to be noted on the chart by the examiner. Mr. Pankratz did not note D.R.'s excessive movements on the chart. Mr. Pankratz could not explain why he failed to note the movements. The Court found convincing Mr. Gadd's testimony and his criticisms of the polygraph examination of D.R.

The Court also considered and agrees with the government's argument that the circumstances surrounding D.R.'s polygraph examination further undermine its reliability. D.R. was asked about events that occurred in 1993, when he was eight or nine years old, during an examination that took place in 1999, some six years later. D.R. had been returned to his family. Adults in the family who had never believed D.R.'s trial testimony took him to Dr. Underwager who interviewed D.R. twice prior to the polygraph examination. By the time of the first interview with Dr. Underwager in October of 1996, D.R. had read FBI interview reports[2] and had seen and heard about letters the defendants sent from prison. D.R. had also been advised of the lengthy prison sentences his uncles received.

For all of these reasons, after reviewing all of the information submitted by the parties on the polygraph evidence in this case, including the book compiled by the National Research Council entitled *The Polygraph and Lie Detection,* and after hearing the expert testimony at the *Daubert* hearing, the Court is convinced that the polygraph evidence in this case is not reliable enough to determine the truthfulness of D.R.'s testimony, and the Court will not consider it for purposes of the motion for new trial.

B. *Alleged Brady Violation*

■ Defendants contend that the prosecutor in their criminal trial knew or should have known prior to trial that the testimony of the child witnesses was false and in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady v. Maryland* and its progeny, state and federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested

by the defense, where the evidence is material to guilt or to punishment. *See, e.g., Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In order to demonstrate a *Brady* violation, a defendant must make a three-part showing: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) that evidence must have been suppressed by the State, either willfully or inadvertently; and 3) prejudice must have ensued. *Strickler,* 527 U.S. at 280, 119 S.Ct. 1936. Withheld evidence warrants overturning a conviction only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.*

■ In his affidavit, Dr. Underwager said that during his 1999 interviews of the children "[f]our of the five children explicitly stated that the prosecutor said to them that they had to lie." (Affidavit of Dr. Underwager at p. 5, ¶ XI.) One child reportedly told Dr. Underwager that the prosecutor promised clothing and other gifts if she testified the way the prosecutor instructed her. (*Id.*) The defense presented no evidence that, prior to trial, anyone told the prosecutor that the children had denied the sexual abuse to them.

As a whole, the testimony of the children at the evidentiary hearing differed in significant respects from their interviews with Dr. Underwager. The Court asked D.R. if anyone, including Donna Jordan, the FBI agents or the prosecutor, told D.R. to lie. D.R.'s response was "no." D.R. testified that he did not tell the pros-

---

**2.** D.R. told Dr. Underwager that the reports did not "tie together."

ecutor that he was lying about the abuse because he just wanted to go home. He thought if he told the prosecutor that his sisters and cousins were abused he would be allowed to go home sooner. D.R. told Dr. Underwager that, before the trial, the prosecutor told him he had to say he was molested by his uncles.[3] When asked about this at the evidentiary hearing, D.R. at first said it was true, but upon further questioning he admitted that the prosecutor never told him to say he had been molested.

L.R.'s testimony about the alleged *Brady* violation even varied during the evidentiary hearing. When asked on direct examination at the evidentiary hearing if anyone told her to lie, L.R. responded, "I don't know. I don't remember." L.R. also stated on direct examination that she told the prosecutor that the abuse did not happen and that made the prosecutor happy. On cross examination, L.R. testified that the prosecutor told L.R. she would buy her toys and clothes if she would lie at trial.

R.R. presented no testimony about the prosecutor during the evidentiary hearing. J.R. testified that the prosecutor promised J.R. she would get to go home after the trial. T.R testified that she met with the prosecutor about two times prior to the trial. When T.R. was asked what the prosecutor told her during the meetings, T.R. responded, "Wouldn't tell me nothing."

■ The evidence does not support defendants' assertion that a *Brady* violation occurred in this case. L.R. was the only child who testified that the prosecutor was aware or should have been aware that allegations of sexual abuse had been denied. L.R's testimony, however, is contradicted by other credible witnesses and is of dubious veracity in light of the record as a whole. Simply put, there is no credible evidence that the prosecutor was aware, prior to the trial of this case, that any of the children ever denied that the abuse occurred. Thus there has been no showing that the prosecutor withheld exculpatory or impeaching evidence, either willfully or inadvertently. In addition, the Court finds that there is no reasonable probability that evidence of L.R.'s alleged pre-trial denial of abuse would have affected the outcome of the trial. This finding is based on the same reasons that the recantations would not produce an acquittal on re-trial. Those reasons are discussed below.

C. *Motion for New Trial Based on Recantations*

■ Rule 33 of the Federal Rules of Criminal Procedure provides for a motion for new trial based on the ground of newly discovered evidence. Whether to grant a new trial based on newly discovered evidence is within the broad discretion of the district court. *See United States v. Begnaud*, 848 F.2d 111, 113 (8th Cir.1988). A motion for a new trial based on the alleged recantation of testimony from a material witness should be viewed with disfavor. *See United States v. Grey Bear*, 116 F.3d 349, 349 (8th Cir.1997). The usual skepticism with which the Court should view new trial motions based on recanted testimony is further heightened in cases in which family members are involved and the witness has feelings of guilt or the family members seek to influence the witness to change his or her story. *See United States v. Provost*, 969 F.2d 617, 621 (8th Cir.1992).

■ When a motion for a new trial in a criminal case is based on newly discovered

---

**3.** There was no evidence presented at trial that D.R. was sexually abused.

evidence, the defendant must meet five requirements:

> 1) the evidence must be in fact newly discovered, that is, discovered since the trial;
>
> 2) the facts must be alleged from which the court may infer diligence on the part of the movant;
>
> 3) the evidence relied upon must not be merely cumulative or impeaching;
>
> 4) it must be material to the issues involved; and
>
> 5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Begnaud*, 848 F.2d at 113 (citing *United States v. Ventling*, 678 F.2d 63, 67 (8th Cir.1982)).

■ The Court's decision whether to grant a new trial in this case is contingent on the fifth requirement. In *Grey Bear*, the Eighth Circuit focused on this requirement that the newly discovered evidence " 'must be of such a nature that, on a new trial, [it] ... would probably produce an acquittal,' " noting that credibility of the new evidence is a prerequisite to this determination. *Grey Bear*, 116 F.3d at 350 (quoting *United States v. LaFuente*, 991 F.2d 1406, 1408 (8th Cir.1993)). The Court explained:

> It is the job of the district court, either on affidavits or after an evidentiary hearing ..., to decide whether the newly discovered evidence is credible, *see [United States v.] Coleman*, 460 F.2d [1038,] 1040 [ (8th Cir.1972) (per curiam), *cert. denied*, 409 U.S. 871 [93

S.Ct. 200, 34 L.Ed.2d 122] (1972)], and, *if so*, whether it would probably produce an acquittal if a new trial were held.

*Grey Bear*, 116 F.3d at 350 (emphasis added). *See also Provost*, 969 F.2d at 620 (probability that a recantation would lead to acquittal "rests in large part on the credibility of the recantation"). Thus credibility of the recantation is the key to determining whether it would produce an acquittal on retrial.

The recantations in this case are even more suspect than most because the testimony recanted implicates the witnesses' uncles.[4] The children did not recant until they were sent home[5] and were being cared for by mothers and a grandmother who did not believe that the abuse occurred and who made it known to the children that they missed their sons and brothers. R.R. testified that, since her return home, all of her family members have been telling her that they do not believe what she and the other children said. As soon as they were returned home, the children began speaking to the defendants on the telephone and some saw letters written by the defendants from prison. L.R. testified that those letters made her feel bad. The children also were made aware of the defendants' lengthy prison sentences. After the trial and before returning home, the children underwent therapy and continued to describe the acts of abuse to their therapists. For example, R.R. had counseling sessions with Dr. Michaleen Muhovich from 1994 to 1997 during which time R.R. discussed the sex-

---

**4.** Desmond Rouse and Jesse Rouse were the children's uncles. Russell Hubbeling and Garfield Feather were first cousins to Desmond Rouse and Jesse Rouse. (TT at 742, 806, 836.) During the evidentiary hearing on the motion for new trial, some of the children referred to Hubbeling and Feather as their uncle.

**5.** There is evidence that during an interview at Children's Home Society on July 7, 1995, J.R. said the abuse did not happen. J.R. later told her counselor, Norma Fennell, that sometimes she would say her uncles did not hurt her because she simply did not want to talk about it, but the truth was that they did abuse her.

ual abuse and never recanted. Julie Brown, the foster mother for J.R. and L.R. from August of 1996 to August of 1997, testified that both girls were afraid of their uncles and did not recant the sexual abuse allegations. Once returned home, the children did not continue supportive therapy and several of the children quit school, further isolating them from anyone other than family members. As Dr. Corwin's testimony indicates, many factors, including the influence from their family members, could have caused the children in this case to recant. The Court agrees that the combination of the influence from the unsupportive families, contact with the defendants by telephone and letters, being made aware of the lengthy prison sentences given to their uncles and having no outside support, pressured the children to recant their truthful testimony about being sexually abused by their uncles.

The interviews conducted by Dr. Underwager do not make the recantations appear credible. In October of 1996, D.R.'s mother and grandmother, and maybe Kathleen Honomichl, drove D.R. and T.R. to Sioux Falls to be interviewed by Dr. Underwager. T.R. would not even look at Dr. Underwager during their 1996 interview. In fact, at one point during the interview, T.R. turned completely away from Dr. Underwager. In 1999, D.R., T.R., R.R., J.R. and L.R. all were taken by their mothers and grandmother to be interviewed by Dr. Underwager. The Court agrees with the testimony of Dr. Mindy Mitnick that Dr. Underwager used some interview techniques which may have influenced the children. For example, Dr. Underwager told the children that he was there to help them get their uncles out of jail and he talked about the lengthy prison sentences imposed. He said that he knew the uncles did not do anything. He suggested to D.R. that he would try to get the story on a television program entitled

*Frontline.* As Dr. Mitnick testified, Dr. Underwager did not question or even gently challenge the recantations; on the contrary, it was clear that Dr. Underwager's purpose was to get the children to deny that the sexual abuse occurred. D.R. admitted that he lied to Dr. Underwager about how the FBI agents handled the interviews because he wanted to show they were bad people. D.R. thinks they are bad people because they caused his uncles to go to prison. Despite Dr. Underwager's attempts to convince R.R. to recant her allegations of sexual abuse, she did not do so during the interview. R.R. was crying and made little eye contact with Dr. Underwager. In response to Dr. Underwager's question whether Uncle Jesse did things to her that were not right, R.R. responded, "Yes."

The credibility of the recantations is also undercut by J.R.'s contacts in December of 1999 with the school counselor, Cheri Freidel. Ms. Freidel was not even aware of this case when J.R. approached her and said that her uncle had touched her in her private parts and that she was afraid her uncles would be coming home for Christmas. J.R. told Ms. Freidel that she and her sister had to tell a social worker that someone made up the stories about her uncles so that they could come home from prison. In accordance with mandatory reporting requirements, Ms. Freidel prepared and sent to the FBI reports of these conversations with J.R., both of which were admitted at the hearing as Government's Exhibits 19 and 20. Ms. Freidel's testimony was believable and corroborated by her written reports.

Furthermore, the children's recanted testimony is supported by the medical evidence in the case, while their recantations are not. *Cf. United States v. Merrival,* 600 F.2d 717, 719 (8th Cir.1979) (considering whether a witness's testimony is cor-

roborated by other evidence). The trial testimony of Dr. Kaplan and Dr. Farrell established that the children had been sexually abused. The children described the abuse to Dr. Kaplan shortly after they were removed from their home. The government concisely summarized some of the pertinent medical testimony in its Post-Hearing Brief:

Dr. Kaplan testified that on January 15, 1994, he examined [J. R.], who was four-and-a-half years old at the time. Trial Transcript (hereinafter referred to as TT) 202. [J.R.] told Dr. Kaplan that Uncle Jess hurt her "privates." TT 203. While Dr. Kaplan was completing the genital examination of [J.R.]., she told him "Uncle Jess hurt me" and when asked where, [J.R.] pointed to her left labia. TT 205. Dr. Kaplan found redness and signs of recent trauma, including a bruise or contusion. TT 205. As Dr. Kaplan examined [J.R.'s] anal opening, [J.R.] said that Uncle Jess has used his hand in her butt. TT 206. Dr. Kaplan found that his physical findings were consistent with sexual abuse. TT 208.

Dr. Kaplan also examined [L.R.], who was six years old at the time. [L.R.] told Dr. Kaplan to "check my peach" because it hurt. TT 213. [L.R.] told Dr. Kaplan that her uncles hurt her. TT 213. Dr. Kaplan found a large bruise and redness on [L.R's] labia majora on the right side and found that [L.R's] hymen was somewhat disrupted. TT 213. He determined that the injury was fairly acute and had occurred within the last few weeks. TT 214. He testified that his findings were consistent with child sexual abuse. TT 214.

Dr. Kaplan also examined [R.R.], who was five years old at the time. While examining [R.R.'s] genitalia, she volunteered spontaneously, "I have a bruise where my uncle put his private spot." TT 219.[R.R.] volunteered that her uncle

Garfield did this at her Grandma's house. TT 219. [R.R.] also stated that her uncle put his private "in my butt." TT 220. Dr. Kaplan found a readily open hymen and a midline scar on the anus at six o'clock. TT 221.

Dr. Kaplan also examined [T.R.], who was seven years old at the time. He found obvious trauma and contusion on her inner labia majora. [T.R.] told Dr. Kaplan, "Uncle Jesse hurt me there." TT 224. Dr. Kaplan found [T.R.'s] hymen to be disrupted and determined that his findings were consistent with sexual abuse. TT 225.

Dr. Farrell conducted further examinations of [R.R., T.R., F.R., L.R., and J.R.] in February of 1994. Dr. Farrell found evidence of tearing and scarring of the anal mucosa on [F.R.] TT 387. In examining [R.R.], Dr. Farrell found obvious damage to the hymenal ring and a scar at six o'clock. TT 390. [R.R.] also had a tearing at the seven o'clock position in the anal area. TT 389 [should be TT 393]. Dr. Farrell found a fusion at the six o'clock position on [L.R.] TT 396. He also found evidence of anal trauma at the twelve o'clock position on [L.R.] TT 398. Dr. Farrell further noted a tag or scar on the hymen at the six o'clock position when he examined [J.R.]. TT 399. Dr. Farrell also found that the anterior portion of he hymenal ring was essentially gone on seven-year-old [T.R.] TT 400.

At trial, even the defendants' medical expert, Dr. Fay, found that the injuries to [L.R., R.R., and J.R.] were very suspicious and may have been acquired through sexual trauma. TT 1023. Dr. Fay also found that the labial injuries to [T.R., L.R., and J.R.] were only seven to ten days old. TT 1016.

(Doc. 519 at pp. 12–13).

The government called Dr. Randall Alexander in its rebuttal at trial. Dr. Alex-

ander is a member of the Board of Governors of the National Committee to Prevent Child Abuse. He testified that it takes considerable force to inflict labial injuries like those exhibited by three of the victims. "It's rare to see one [in young girls] and to see three of them show up is just ... rareness to the third power." *Rouse,* 111 F.3d at 565–66 (quoting the trial transcript).

The victims' trial testimony was consistent with the physical evidence and with their reports of sexual abuse to Dr. Kaplan, reports that were made before the victims were interviewed by the FBI and prior to the start of their counseling sessions. The jury that heard all of the evidence found the defendants guilty of sexual abuse. The recantations simply are not credible in light of the evidence corroborating the victims' trial testimony. In each of the instances in which a defendant was found guilty, there was corroborating physical injury to the victim. A summary as to each victim is as follows:

1. T.R.: Her hymenal ring was essentially gone, the entire area was irritated, there were furrows in her vagina and obvious trauma and contusion on her labia majora. Each of the four defendants was convicted of one count involving contact between the penis and vagina. Jesse Rouse was found not guilty of contact between the penis and anus, which was consistent with no anal injury being noted.

2. L.R.: She had a fairly acute injury on the right side of her labia majora, damage to her hymenal ring, furrowing of the vagina, chronic irritation or trauma to the vagina and "clue cells" in the vagina known to be sexually transmitted. Garfield Feather was found guilty of contact between the penis and vagina. Des-

mond Rouse was convicted of contact of the genital opening with a finger. Jesse Rouse was found not guilty of contact of the genital opening with a finger and contact between the penis and vagina. Russell Hubbeling was found not guilty of contact between the penis and vagina. Desmond Rouse was found not guilty of contact between the penis and vagina and of assault with a dangerous weapon.

3. R.R.: She had a sagging vagina, a scar on her anus and tearing in the anal area consistent with anal intercourse, as well as very significant damage to the hymenal ring. Garfield Feather was found guilty of one count of contact between the penis and vagina and one count of contact between the penis and anus. Desmond Rouse was found guilty of one count involving contact between the penis and anus and not guilty of contacting the genital opening with a finger. Duane Rouse was found not guilty of contact between the penis and vagina.

4. J.R.: She had a bruise or contusion on her left labia and a scar on her hymen where a tear had healed. Jesse Rouse was found guilty of contact between the penis and vagina and not guilty of contact between the penis and anus. Desmond Rouse was found not guilty of one count of contact between the penis and vagina and one not guilty of one count of contact between the penis and anus.

5. F.R.: This 20 month old baby did not ever testify, nor recant. She had tearing and scarring of her anal mucosa. Russell Hubbeling was found guilty of one count of contact between the penis and anus.

It is the Court's experience that generally in the case of a young child victim in a sexual abuse case there is often an acquittal if there is no corroborating evidence of some sort. The corroborating evidence need not be physical injury, but corroborating evidence of some sort seems often to be required by a jury before convicting.

For all of these reasons, the Court determines that there is no reasonable probability that the recantations would produce an acquittal if a new trial were held, and the defendants' motion for new trial must be denied. Accordingly,

IT IS ORDERED:

(1) that the defendants' request that the Court consider the results of D.R.'s polygraph examination as evidence in support of the Motion for New Trial is denied; and

(2) that the defendants' Motion for New Trial (doc. 428) is denied.