**UNITED STATES of America,**
**Plaintiff,**

v.

**Orville J. BLACK SPOTTED HORSE, Defendant.**

**No. CR 00–30028–RHB.**

United States District Court,
D. South Dakota,
Central Division.

Sept. 27, 2000.

---

20. In such event, however, the case once again would be subject to removal to federal court. *See* 28 U.S.C. § 1446(b).

Jay P. Miller, Assistant United States Attorney, Pierre, SD, for Plaintiff.

Jana Miner, Assistant Federal Public Defender, Pierre, SD, for Defendant.

## ORDER ADOPTING MAGISTRATE'S FINDINGS AND RECOMMEN-DATIONS

BATTEY, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the above-entitled case was referred to Magistrate Judge Mark A. Moreno. On August 31, 2000, Magistrate Judge Moreno issued his findings and recommendations as to defendant's motion to suppress statements made on September 20, 1999, and December 8, 1999. Magistrate Judge Moreno recommended that defendant's motion be denied.

The standard of review of a magistrate judge's findings and recommendations is de novo. 28 U.S.C. § 636(b). Defendant has ten days to file objections to the magistrate's findings and recommendations. *Id.* According to the Eighth Circuit Court of Appeals, "[O]bjections must be timely and specific to trigger de novo review by the District Court of any portion of the magistrate's report and recommendation." *Thompson v. Nix,* 897 F.2d 356, 357–58 (8th Cir.1990). Defendant has not objected to the findings and recommendations of the magistrate judge. The magistrate judge's report was dated August 31, 2000; therefore, the ten days has lapsed. Given that defendant has not objected, a de novo review by this Court is not triggered. Based upon the Court's conclusion that the findings and recommendations of Magistrate Judge Moreno are reasonable, it is hereby

ORDERED that the findings and recommendations issued by Magistrate Judge Moreno dated August 31, 2000, are adopted by this Court.

IT IS FURTHER ORDERED that defendant's motion to suppress (Dockets # 20) is denied.

## REPORT AND RECOMMENDATION FOR DISPOSITION OF DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

MORENO, United States Magistrate Judge.

### INTRODUCTION

Defendant, Orville J. Black Spotted Horse (Black Spotted Horse), filed a Motion to Suppress, with incorporated legal authority, on July 18, 2000. A hearing on the Motion was subsequently held on August 24, 2000 in accordance with the District Court's [1] July 24, 2000 Order of Reference. Because Black Spotted Horse's Motion is a dispositive one, this Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following report and recommendation for disposition of Black Spotted Horse's Motion.

### PROCEDURAL HISTORY

Black Spotted Horse was originally charged by indictment filed on April 20, 2000 with Attempted Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 1153, 2241(a) and 2246(2). The indictment alleges that Black Spotted Horse forcibly attempted to engage in a sexual act with Valencia White Hat near St. Francis, South Dakota, on the Rosebud Indian Reservation. Black Spotted Horse has pled not guilty to the charge and is currently out on bond.

Prior to his release, Black Spotted Horse filed a Motion to Suppress and requested a hearing. In his Motion, Black Spotted Horse seeks to suppress any and all statements made by him on September 20, 1999 and December 8, 1999.

Upon review of the Motion and after consultation with counsel, the Court held a hearing at which two witnesses testified and five exhibits were received into evidence. The Court thereafter took the matter under advisement.

### FACTUAL BACKGROUND

On September 18, 1999, Valencia White Hat reported that Orville Black Spotted Horse tried to rape her. Based on information gathered by Rosebud law enforcement officials, Black Spotted Horse was arrested on tribal charges and incarcerated at the Rosebud Tribal Jail. The Federal Bureau of Investigation (FBI) was contacted and Special Agent Thomas Jones was assigned to investigate any federal charges arising out of the incident.

As part of his investigation, Jones, along with Rosebud Criminal Investigator Grace Her Many Horses, interviewed Black Spotted Horse on September 20, 1999 in a detective's office at the Rosebud Jail. Prior to the commencement of the interview, Jones advised Black Spotted Horse of his constitutional rights via a written interrogation and advice-of-rights form. Black Spotted Horse read the form, signed it and agreed to talk to Jones without the benefit of counsel. The interview began shortly before 11:30 a.m. and continued for just under an hour until a break was taken. During this phase of the interview, Black Spotted Horse denied any wrong-doing, including having physical contact with White Hat.

Following an eight minute break, the interview continued, with Jones confronting Black Spotted Horse with what Jones believed to be inconsistencies in Black Spotted Horse's version of what took place. Black Spotted Horse persisted in his denials and became angry at Jones' accusations. Jones then began to use a "theme development" type of interview technique and Black Spotted Horse calmed down. "Biting off on" Jones' consensual sex theme, Black Spotted Horse changed his story. He continued to deny trying to rape White Hat, but did admit to hugging and kissing her and pulling her pants and underwear down. He insisted though that he "backed off" after noticing that she was

1. The Honorable Richard H. Battey, Senior United States District Judge, presiding.

menstruating. This portion of the interview lasted approximately an hour. .

After a three-minute break, Jones resumed the interview. When Black Spotted Horse once again denied that he tried to rape White Hat, Jones asked Black Spotted Horse if he would write out a narrative of what happened. Black Spotted Horse then provided Jones with a written statement summarizing what he had told Jones during the oral portion of the interview.

Before parting company that day, Jones asked Black Spotted Horse if he would submit to a polygraph examination some time in the future. Black Spotted Horse said that he would and an examination was later scheduled for December 8, 1999 in Pierre.

Subsequent to the interview but before the scheduled polygraph examination, Black Spotted Horse was released from tribal custody. Following his release, Black Spotted Horse indicated that he was still willing to take the examination but that he did not have a ride from Rosebud to Pierre. Based on these representations, arrangements were made to have Black Spotted Horse, along with another individual (who was scheduled to be polygraphed right after Black Spotted Horse), transported to Pierre by a Rosebud Criminal Investigator.

Black Spotted Horse was introduced to and met with Lester Davis, a Special Agent with the FBI, in the grand jury room of the Federal Building around 9:30 a.m. on December 8th. Davis explained how the polygraph worked and informed Black Spotted Horse of his *Miranda* rights from the same advice-of-rights form Jones had previously gone over with him. Davis read the form out loud and Black Spotted Horse signed the same. Thereafter, Black Spotted Horse executed a poly-

graph interview consent form which advised him that he could refuse to take the test, could stop the test at any time and could refuse to answer any individual questions.

During the pre-test portion of the examination, Davis obtained background information from Black Spotted Horse and went over the statements that he and White Hat had given to Jones. Davis and Black Spotted Horse also went through the test questions, including the two relevant questions pertaining to whether Black Spotted Horse attempted to force White Hat to have sexual intercourse with him and whether he hit White Hat on the night in question. Once Black Spotted Horse was hooked up to the polygraph components, he was asked eight test questions, administered an acquaintance test[2] and then asked the test questions two more times. The test results revealed clear deception on Black Spotted Horse's part with respect to the relevant questions. Davis advised Black Spotted Horse of the test results and proceeded into a post-test interview.

Despite using various interview techniques, Black Spotted Horse "pretty much stuck to [his earlier] story." At Davis' request, Jones entered the room and he and Davis interrogated Black Spotted Horse together. A short time later, Black Spotted Horse asked to speak to Jones in private. Davis then left the room and while talking to Jones alone, Black Spotted Horse admitted that he attempted to rape White Hat. Jones then called Davis back into the room and Black Spotted Horse repeated and provided details of the attempted rape and executed a written statement, prepared by Davis, concerning the incident.

**2.** In this test, the examinee is asked to write down a number and hide it from the examiner, then lie about the number that is chosen. The test is designed to demonstrate to the examinee that a polygraph instrument cannot tell the difference between white lies and oth-er lies, it can only tell the examiner when someone is not being truthful. It is also designed to show the examinee that the polygraph test does in fact work. *See United States v. Bad Hand,* 926 F.Supp. 891, 896, n. 6 (D.S.D.1996).

Black Spotted Horse's conversations with Davis and Jones in the grand jury room lasted about ninety minutes. At the conclusion of the interview and upon reading and signing the statement, Black Spotted Horse left the room and was then driven back to Rosebud later that same day. He was not arrested federally on the attempted rape charge until the latter part of April, 2000.

## DISCUSSION

### A. Voluntariness

■ It is well-established that a defendant's statement, to be admissible under the Fifth Amendment, must be voluntary, "that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (*quoting* 3 Russell, *Crimes* 478 (6th ed.)). The Supreme Court has observed that certain methods of gathering incriminating statements "are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The question presented here, as in any other case involving inculpatory statements made by a defendant, is whether law enforcement officials engaged in any coercive misconduct or overreaching, *Colorado v. Connelly*, 479 U.S. 157, 164–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987), such that the defendant's statements were not freely self-determined, but rather the product of an overborne will, *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

■ The test used to apply the constitutionally-based standard of voluntariness is whether "in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir.1989) (*citing Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)); *see also; Winfrey v. Wyrick*, 836 F.2d 406, 410 (8th Cir.1987), *cert. denied*, 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988). Two factors must be considered in the voluntariness inquiry: the conduct of law enforcement officers and the capacity of the suspect to resist pressure to confess. *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir.1995); *United States v. Makes Room For Them*, 49 F.3d 410, 415 (8th Cir.1995). According to the Eighth Circuit, a reviewing court must utilize:

> [A] flexible totality of the circumstances approach, considering the specific interrogation tactics employed, the details of the interrogation and the characteristics of the accused.

*United States v. Wilson*, 787 F.2d 375, 381 (8th Cir.), *cert. denied*, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986).

■ The burden of proof on the issue of voluntariness is one of preponderance of the evidence. *Connelly*, 479 U.S. at 168–69, 107 S.Ct. 515; *United States v. Wright*, 706 F.2d 828, 830 (8th Cir.1983). To be admissible, the government must establish by a greater weight of the evidence that a defendant's statements were voluntarily made.

■ After reviewing the evidence of record and assessing the credibility of the witnesses who testified, the Court is unable to find that the requisite coercive or overreaching conduct was present on either September 20, 1999 or December 8, 1999 so as to make Black Spotted Horse's incriminatory statements involuntary.

At the outset, it should be pointed out that Black Spotted Horse was Mirandized prior to being questioned on September 20th and December 8th. Recently, the Supreme Court reaffirmed that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that

the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States,* 530 U.S. ——, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) (*quoting Berkemer v. McCarty,* 468 U.S. 420, 433, n. 20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). That is not to say that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession. *See Berkemer,* 468 U.S. at 433, n. 20, 104 S.Ct. 3138. Black Spotted Horse's pre-interview *Miranda* advisements though, make it much more difficult for him to rebut the government's assertion that his statements to Jones, Her Many Horses and Davis were voluntary.

Significantly, throughout the entire course of the September 20th interview, Black Spotted Horse denied any criminal culpability. Although his story changed somewhat, he steadfastly maintained that he never tried to rape White Hat. The various interview techniques Jones used in an effort to obtain inculpatory admissions from Black Spotted Horse had little, if any, success and most certainly did not overbear his will.

More importantly, even assuming that he was in custody at the time of both interviews [3], no threats or promises were made to Black Spotted Horse during the interviews and no undue influence or pressure was exerted on him. Contrary to Black Spotted Horse's claim, Jones did not use any deceptive stratagems or coercive questioning tactics to extract statements from Black Spotted Horse. It was not improper to inform Black Spotted Horse that his polygraph test results indicated deception or to resume questioning given the adverse test results. *Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). It was likewise not impermissible to elicit further statements from Black Spotted Horse by questioning his denial of salient facts. *Id.* Numerous cases have

held that questioning tactics such as deception, sympathy and other "suggestive" techniques will not render a defendant's admissions involuntary unless the overall impact of the interrogation caused his will to be overborne. *Jenner,* 982 F.2d at 334 (citing cases); *Makes Room For Them,* 49 F.3d at 415. "[T]here is nothing inherently wrong with efforts to create a favorable climate for confession." *Jenner,* 982 F.2d at 334 (*quoting Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988)). As the Supreme Court adeptly observed some time ago, "very few people give incriminating statements in the absence of official action of some kind." *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

On this record, the Court is unable to find the requisite coercive activity and/or overreaching by law enforcement authorities. At no time did Black Spotted Horse express a desire to stop the interviews or to speak with an attorney. *See Jorgensen,* 871 F.2d at 730. The duration, tone and overall atmosphere of the interviews were not hostile or intimidating. Moreover, it appears, based on what Black Spotted Horse said and did during the interviews, that he was alert and very much in control of his faculties. *See Jenner,* 982 F.2d at 334. Black Spotted Horse has failed to demonstrate that Jones, Her Many Horses and Davis overwhelmed his will and "extorted" incriminating statements from him. *Jenner,* 982 F.2d at 334; *Makes Room For Them,* 49 F.3d at 415.

The fact that the vast bulk of Black Spotted Horse's inculpatory statements came immediately following the polygraph examination, without renewed *Miranda* warnings, is of little, if any, significance because the circumstances present, when considered *in toto,* plainly show that the statements were made voluntarily. *Wyrick v. Fields,* 459 U.S. 42, 47–49, 103 S.Ct.

---

3. It is not clear that Black Spotted Horse was in custody so as to trigger the protections of *Miranda* at the time of the interviews/poly-graph examination on December 8th. *See Bad Hand,* 926 F.Supp. at 897–98.

394, 74 L.Ed.2d 214 (1982); *on remand,* 706 F.2d 879, 880–82 (8th Cir.), *cert. denied,* 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); *McDowell v. Leapley,* 984 F.2d 232, 234 (8th Cir.1993); *Jenner,* 982 F.2d at 333–34; *Vassar v. Solem,* 763 F.2d 975, 977–78 (8th Cir.1985); *United States v. Iron Thunder,* 714 F.2d 765, 771–72 (8th Cir.1983); *United States v. Jackson,* 712 F.2d 1283, 1285–86 (8th Cir.1983); *United States v. Eagle Elk,* 711 F.2d 80, 81–83 (8th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).

As such, the admissions made by Black Spotted Horse to Jones, Her Many Horses and Davis were voluntary, and not the product of coercive interrogation or overreaching on their part. *Id.; Kilgore,* 58 F.3d at 353; *Makes Room For Them,* 49 F.3d at 415; *Jorgensen,* 871 F.2d at 729–30; *Winfrey,* 836 F.2d at 410–12; *Rohrbach,* 813 F.2d at 144. Black Spotted Horse was advised of his rights on two separate occasions and voluntarily confessed. Because Jones, Her Many Horses and Davis took no action that could objectively be considered as coercion or overstepping their bounds, there is nothing to refute the voluntariness of Black Spotted Horse's statements. The government has thus established, by a preponderance of the evidence, that Black Spotted Horse's statements satisfy the voluntariness requirements of both the Constitution and 18 U.S.C. § 3501.

## B. Waiver

■ Having determined that Black Spotted Horse's statements to Jones, Her Many Horses and Davis were voluntary, the Court must next proceed to decide whether his waivers were valid based on "the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused," *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (*quoting Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), when measured against applicable precedent.

The inquiry into whether a waiver is valid or has been coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (*citing Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)):

> First, the relinquishment of the rights must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogtion" reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (*quoting Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)); *see also, Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Butler,* 441 U.S. at 374–75, 99 S.Ct. 1755. In light of the Supreme Court's teachings, the Court must determine whether Black Spotted Horse's waiver was "knowing and intelligent." Inasmuch as the voluntariness issue has already been decided, the Court is left only with the task of ascertaining whether Black Spotted Horse's waivers were "knowing" and "intelligent".

Black Spotted Horse was advised of his *Miranda* rights and waived these rights in writing before being questioned on either September 20th or December 8th. The written waivers themselves constitute strong evidence that Black Spotted Horse had a clear understanding of his rights and intended to and did give up the same. *Butler,* 441 U.S. at 373, 99 S.Ct. 1755 ("an express written ... statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the valid-

ity of that waiver ...").  In addition, Black Spotted Horse's law enforcement experience together with his actions and conduct during the course of the interviews weigh heavily in favor of a valid waiver. Based on the entirety of the record, there can be little doubt that the government has met its burden, by a preponderance of the evidence, that Black Spotted Horse knowingly and intelligently waived his *Miranda* rights before being questioned and making inculpatory remarks to law enforcement officials on September 20th and December 8th.

The fact that Black Spotted Horse's admissions, during the December 8th interview, were made in response to questions asked of him during a polygraph examination did not serve to vitiate his waiver or the validity of the same.  By agreeing to submit to the examination, Black Spotted Horse consented to questioning and waived not only his right to be free of contact with law enforcement authorities in the absence of an attorney, but also his right to be free of interrogation about the crime of which he was suspected.  *See Fields,* 459 U.S. at 47, 103 S.Ct. 394, *on remand,* 706 F.2d 879, 881–82; *Eagle Elk,* 711 F.2d at 82–83.  Regardless of what Black Spotted Horse's anticipations were regarding the examination and the questions he would be asked, it would have been unreasonable for him to assume that he would not be informed of the polygraph readings and asked to explain any unfavorable results.  *See Fields,* 459 U.S. at 47, 103 S.Ct. 394, *on remand,* 706 F.2d at 881. Moreover, Black Spotted Horse was told that he could have a lawyer present with him while being questioned and that he could stop the questioning at any time. *See Fields,* 459 U.S. at 47–48, 103 S.Ct. 394.  Merely disconnecting the polygraph equipment would not remove this knowledge from his mind.  *See id.* at 47, 103 S.Ct. 394; *see also, Vassar,* 763 F.2d at 978; *Eagle Elk,* 711 F.2d at 83.

In the Court's view, it is plain from the record that Black Spotted Horse fully understood and expressly waived his rights prior to being interviewed and submitting to the polygraph examination.  As such, he voluntarily, intelligently, knowingly and intentionally relinquished both his Fifth and Sixth Amendment rights during the interviews/examination.  Therefore, the inculpatory statements made by Black Spotted Horse on September 20th and December 8th are admissible at trial.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing and in accordance with 28 U.S.C. § 636(b)(1), the Court concludes that Black Spotted Horse's September 20, 1999 and December 8, 1999 statements were made voluntarily and after he knowingly and intelligently waived his rights.  Accordingly, the Court

RECOMMENDS that Black Spotted Horse's Motion to Suppress, Docket No. 21, be DENIED in all respects.

August 31, 2000.

## NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge.  *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72.**