2006 DSD 4

**UNITED STATES of America,**
**Plaintiff,**

v.

**Dean DUPRIS, Defendant.**

**No. CR 05–30024, 2006.**

United States District Court,
D. South Dakota,
Central Division.

Feb. 3, 2006.

---

**3.** That said, I express no opinion on the evidentiary value of any of the settlement agreements.

Randolph J. Seiler, Esq., Assistant United States Attorney, Pierre, SD, for Plaintiff.

Edward G. Albright, Esq., Assistant Federal Public Defender, Pierre, SD, for Defendant.

## ORDER

KORNMANN, District Judge.

Defendant filed a motion for suppression of statements (Doc. 25) and a supporting memorandum (Doc. 26). U.S. Magistrate Judge Moreno conducted evidentiary hearings on September 7, 2005, and January 19, 2006, and filed and served a report and recommendation for disposition of the motion (Doc. 64). The Court has conducted a *de novo* review of the transcripts of the hearings (Doc. 66 and 67), all exhibits received in evidence at the hearings by the magistrate (Doc. 36), and all the files and records herein. This includes but is not limited to the Cheyenne River Sioux Tribe Constitution and Bylaws, the tribal law and order code (1978 revision), "law and order issues 1978 through 2004", law and order code amendments, and the tribal court documents as to Dean Dupris. I have also listened to the tape recording (Exhibit A) of the arraignment in tribal court of the defendant. Defendant has timely filed objections (Doc. 72) to the recommendation of the magistrate and the objections have been considered.

One of the principal issues here is, of course, whether this case comes within the legal principles of *United States v. Red Bird*, 287 F.3d 709 (8th Cir.2002), a case in which I was the trial judge, suppressed evidence, and was affirmed on appeal. I agree with the magistrate that the cases are different and *Redbird* does not apply. I find nothing to indicate that the magistrate's assessment of credibility issues should be overturned. Part of defendant's testimony went "back and forth", depending upon who was questioning him.

I am skeptical of the statement of the magistrate that FBI agent Trone made it clear to the defendant "that the investigation had nothing to do with the suspension." Rather, it appears that any question whether the investigation dealt with a personnel matter was not really addressed. Trone would have had no obligation to assure defendant that the investigation was not dealing with a personnel matter. Any reasonable and rational FBI agent would not think that the defendant would have thought anything else than that the defendant was under investigation for a very serious federal crime. Certainly, the defendant was not misled. The defendant claims to have thought that the purpose of the federal investigations was somehow tied into his personnel problems. Even assuming such belief to be true, such belief

would have been objectively totally unreasonable. Given the background, law enforcement training, experience and education of the defendant, he would have known very well what the federal agents were doing and why.

Although there is a fair amount of confusion as to what happened in tribal court, what customs or practices are which fly in the face of written documents, including the tribal code, when and how a court record was changed, and related matters, I assume for the purpose of this opinion that defendant was represented by a lay representative of the tribal defender's office during his arraignment in tribal court. I also assume that such lay representative, although never having been formally appointed to represent defendant, was still representing defendant in the tribal court matter at the time of the federal interviews. I also assume that defendant had not waived his right to lay representation at the time he was arraigned in tribal court. I thus disagree with the conclusion or finding by the magistrate that defendant had "waived his right to counsel" in tribal court, but only if that is taken to mean that defendant had waived his right to representation by a lay representative. If the word "counsel" means a lawyer, I agree with the magistrate that the defendant has clearly waived his right to be represented by a lawyer in tribal court. The defendant has also waived his right to be represented by a lawyer (or anyone else for that matter) in connection with the statements he gave. None of this does anything to cause the court to not adopt the report and recommendations of the magistrate.

It is obvious that the polygraph results and the outcome should be suppressed.

The objections should be overruled, the motion denied in part and granted in part, and the report and recommendations accepted and adopted.

Now, therefore,

IT IS ORDERED, as follows:

1) That the motion for suppression of evidence in the nature of statements (Doc. 25) is hereby denied in part and granted in part, as set forth in the report and recommendations and as described above.

2) The report and recommendations of the magistrate (Doc. 64) is hereby accepted and adopted.

3) The objections of the defendant (Doc. 72) are overruled.

## REPORT AND RECOMMENDATIONS FOR DISPOSITION OF DEFENDANT'S MOTION TO SUPPRESS

MORENO, United States Magistrate Judge.

[¶ 1] Defendant, Dean Dupris, has filed a Motion to Suppress, and supporting Memorandum, Docket Nos. 25, 26. In his Motion, Defendant seeks to suppress any and all statements made by him to federal and tribal investigators on October 27, 2004, and those made during and in connection with a polygraph examination administered on January 13, 2005, including the outcome of such an examination and the fact that one was administered to him. Plaintiff, United States of America (Government), has filed a written Response to the Motion resisting the same and requesting that it be denied in its entirety.

[¶ 2] On September 7, 2005 and January 19, 2006, this Court held evidentiary hearings on the Motion at which eight witnesses testified and fourteen exhibits were admitted. Because the Motion is a dispositive one, the Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following report and

recommendation for disposition of the Motion.

## I.

[¶ 3] Defendant, a 26–year–old high school graduate and former tribal policeman, is charged with one count of sexual abuse and two counts of tampering with a witness. The Indictment alleges that Defendant sexually abused Robin Turning Heart at a time when she was asleep or passed out in her bedroom. He is also charged with corruptly persuading Kirk High Elk to make, or attempt to make, false and misleading statements (a) to law enforcement officials about the commission of a possible federal offense and (b) to influence, delay and prevent High Elk from testifying in an official proceeding. Defendant has pled not guilty to all three charges and requested a jury trial. The trial is scheduled to commence on February 22, 2006.

## II.

[¶ 4] The salient facts can be briefly recited. During the early morning hours of September 28, 2004, Turning Heart reported that she had been raped by Defendant at her residence in the Bear Creek area on the Cheyenne River Indian Reservation. Tribal and federal authorities thereafter investigated the alleged rape and on October 27, 2004, Defendant was interviewed outside his residence in Eagle Butte. FBI Agent Brett Lonnel Bray, conducted the interview, with Sonny Garreau, a detective with the Cheyenne River Sioux Tribe (CRST), in the latter's sport utility vehicle. After being advised of his Griffin rights and Miranda warnings, Defendant agreed to talk to Bray and Garreau and admitted to having consensual sexual intercourse with Turning Heart while she was awake and aware of what was happening. At the time of the interview, Defendant was suspended by, but not terminated from, the CRST Police De-

partment. At the end of the interview, Defendant agreed to take a polygraph and then left the vehicle and went into his house a short distance away.

[¶ 5] On January 3, 2005, Defendant was charged in tribal court with rape, aggravated assault, assaulting a law enforcement officer, aggravated trespass and public nuisance. The next day, he appeared in tribal court with lay counsel, Carson Mound, was arraigned and pled not guilty to all five charges.

[¶ 6] On January 13, 2005, Defendant appeared, without counsel, at the Walter Miner Law Enforcement Center in Eagle Butte and submitted to a polygraph examination conducted by FBI Agent Robert Trone, a trained polygrapher. Trone opined that Defendant's responses during the examination were indicative of deception and advised Defendant of this. When Trone questioned him further, Defendant changed his story and made inculpatory statements about the Turning Heart incident.

[¶ 7] Defendant seeks now to suppress his October 27th and January 13th statements on voluntariness grounds under the Fifth Amendment, his January 13th statements on Sixth Amendment grounds, citing *United States v. Red Bird,* 287 F.3d 709 (8th Cir.2002), and the polygraph exam and its results as well based on Fed. R.Evid. 403 and *United States v. Waters,* 194 F.3d 926 (8th Cir.1999).

## III.

[¶ 8] The Fifth Amendment prohibits the use of involuntary statements at trial. *Chavez v. Martinez,* 538 U.S. 760, 769, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003); *see also United States v. Bordeaux,* 400 F.3d 548, 560 (8th Cir.2005). A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear a sus-

pect's will and critically impair his capacity for self-determination. *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir.2004) (*en banc* ), *cert. denied,* 543 U.S. 1145, 125 S.Ct. 1292, 161 L.Ed.2d 105 (2005); *see also United States v. Brave Heart,* 397 F.3d 1035, 1040 (8th Cir.2005). Whether the suspect's will has been overborne is determined by examining the totality of the circumstances, including both the conduct of officers in exerting pressure on the suspect and the suspect's ability to resist that pressure. *Id.* The Government bears the burden of persuasion and must prove by a preponderance of the evidence that the suspect's statements were voluntary. *Id.*

█ [¶ 9] After reviewing the record and assessing the credibility of the witnesses who testified, the Court is unable to find that the requisite coercive or overreaching conduct was present on October 27th so as to make his statements to Bray and Garreau involuntary. No threats or promises were made to Defendant and no undue influence or pressure was exerted on him. The duration, tone and overall atmosphere of the interview were not hostile or coercive. The record indicates that Defendant's will was not overborne. Instead, he cooperated with Bray and Garreau, answered the questions posed to him, proclaimed that the sexual intercourse he had with Turning Heart was with her knowledge and consent and even agreed to submit to a polygraph examination at a later time. There can be little doubt that Defendant's statements were voluntary. *United States v. Plumman,* 409 F.3d 919 (8th Cir.2005); *Bordeaux,* 400 F.3d at 560–61.

█ [¶ 10] The same is true with respect to Defendant's January 13th statements. That day, Defendant went to the Law Enforcement Center on his own, was advised of his rights, agreed and submitted to a polygraph examination and provided detailed descriptions of what happened at Turning Heart's residence. After being questioned by Trone and Bray together for a short time, Defendant terminated the interview and left the room. No physical or psychological pressure was used on Defendant that overbore his will. Nor were Defendant's statements the product of coercive interrogation or undue influence on the part of the agents. Because the agents took no action that could objectively be considered as coercion or overstepping their bounds, there is nothing to refute the voluntariness of Defendant's statements. As such, no legal basis exists for suppressing the statements Defendant made to Trone and Bray on January 13th. *See United States v. Bad Hand,* 926 F.Supp. 891, 901–02 (D.S.D.1996).

[¶ 11] The fact that Defendant's statements came during and in connection with a polygraph examination, is of little, if any, significance because the circumstances present, when considered *in toto,* plainly demonstrate that his statements were made voluntarily. *See United States v. Black Bear,* 422 F.3d 658, 664–65 (8th Cir.2005). Having reviewed the record, the Court is not persuaded that the overall impact of the polygraph examination, or the interrogation that occurred both before and after it, caused Defendant's will to be overborne. *Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *Bad Hand,* 926 F.Supp. at 901

[¶ 12] Defendant maintains that after he was told that he had "failed" the polygraph examination, he stood up and asked to leave, but Trone told him to "sit back down, that a report had to be done [and] more questions [had] to be asked." Defendant claims that he did what he was told to do because he believed he had to. Trone disputes this, and is steadfast that he at no time ever told Defendant that he had to

stay and answer questions. The Court observed both Trone and Defendant testify and found Trone's testimony to be more credible, particularly on this issue. In the Court's view, Defendant was not forced to stay and continue his conversation with Trone, but rather, acquiesced to doing so on his own.

[¶ 13] Defendant also contends that a reasonable person in his position, who was subject to an administrative inquiry by a police department, would feel obligated to cooperate and answer questions posed to him by other law enforcement officers out of fear that refusal to do so might result in termination of employment. Although Defendant's suspension from the CRST Police Department was briefly discussed during the interview, Trone made it clear to Defendant that he was conducting a federal investigation and that the investigation had nothing to do with the suspension. From the Court's own observations, Defendant, a police officer and high school graduate, appeared to be articulate and of at least average intelligence. Defendant's "fears" of losing his job if he did not stay and answer a FBI agent's questions are not ones that a reasonable person would have likely had. The suspension of a tribal police officer is not typically a matter that the FBI would be called upon to investigate for, and on behalf of, an Indian tribe. And, it is improbable that the FBI, if called upon to question a tribal officer about a personnel (as opposed to a criminal) matter, would Mirandize the officer and disavow any involvement in such a matter directly to him. Here, Defendant knew, or reasonably should have known, that Trone and Bray were interviewing him as a suspect in a federal criminal investigation and not as part of some tribal related employment matter.

[¶ 14] After reviewing the record and watching Defendant testify, it is clear that Trone and Bray did not overbear Defendant's will or grievously impair his capacity for self-determination. This being the case, Defendant's January 13th statements were made voluntarily and are admissible under the Fifth Amendment.

## IV.

[¶ 15] Defendant alternatively claims that his Sixth Amendment right to counsel attached when he appeared in tribal court with an assistant public defender for the CRST and pled not guilty to raping Turning Heart.[1] He maintains now that any waiver by him of his right to counsel prior to his January 13th polygraph induced interrogation was invalid under *Red Bird, Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). According to Defendant, his statements to Trone during the polygraph examination and post-test questioning violated the Sixth Amendment, as interpreted by appellate courts in these three decisions, and must therefore be suppressed.

[¶ 16] The Sixth Amendment provides that an accused shall enjoy the right to have the assistance of counsel for his defense in all criminal prosecutions. The accused is guaranteed the right to rely on counsel as a "medium" between himself and governmental authorities and is violated when those authorities obtain incriminating statements by knowingly circumventing his right to have counsel present in a confrontation with them. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In *Massiah*, the United States Supreme Court held that a

---

**1.** The tribal rape charge is based on the same factual circumstances as the sexual assault offense Defendant is charged with in the federal Indictment.

defendant's Sixth Amendment rights were violated when federal agents deliberately elicited incriminating statements from him after he had been indicted and in the absence of counsel. 377 U.S. at 206, 84 S.Ct. 1199. Later, the Supreme Court, relying on *Massiah,* held that under the Sixth Amendment, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Jackson,* 475 U.S. at 636, 106 S.Ct. 1404. *Massiah* and *Jackson,* thus make clear that the Sixth Amendment right to counsel attaches against the Government at the time of a defendant's federal court arraignment. The issue here is whether this right attached when Defendant was arraigned in tribal court for the rape of Turning Heart.

### A.

[¶ 17] The question of whether Defendant's Sixth Amendment right to counsel attached at his tribal arraignment is hotly disputed by the parties. The Government, on the one hand, asserts that Mound is not a licensed attorney in any federal or state court or even law trained and therefore, is not "counsel" for purposes of the Sixth Amendment. Defendant argues that a more functional approach should be used when deciding this question. He contends that despite Mound's educational shortcomings, she nonetheless was skilled enough to provide Defendant with the legal assistance necessary to protect his

rights and thus, was his "counsel" or "lawyer" within the meaning of *Red Bird.* The Court, however, disagrees with Defendant's position, believing instead that *Red Bird* is distinguishable and that Defendant's Sixth Amendment right to counsel was not triggered until he made his initial appearance in federal court on April 27, 2005. Stated another way, Defendant's right to counsel did not attach because he never appeared in tribal court with "counsel" or a "lawyer" prior to the January 13th interrogation.

[¶ 18] The following facts and circumstances aptly show this to be the case:

1. The CRST Constitution does not guarantee tribal members the right to an attorney in tribal court. In tribal court, a criminal defendant is advised that he has the right to retain counsel at his own expense, that if he "qualifies", he may be represented by the tribal public defender, but that he does not have the right to professional or lay counsel, other than the public defender, at the expense of the Tribe. Defendant, like other tribal defendants, was informed of these matters in a Statement of Rights form he read and signed at his January 4th arraignment.[2]

2. The Statement both Defendant and CRST Associate Judge Georgia Gunville signed, contains the following admonition: *"NOTE:* If you

---

**2.** Where exactly this information comes from is not all together clear. It is not provided for in the CRST Constitution. Under the Tribe's Law and Order Code, a defendant has the right to appear at all criminal proceedings and to defend the charges against him in person and "by counsel," but has no "right to have appointed professional counsel provided at the Tribe['s] expense." Law and Order Code of CRST, Tit. II, R. 3(a). At arraignments in tribal court, a defendant must be

"informed of his right to counsel" and that if he "desires, but does not presently have counsel, he will be given a reasonable time to secure such before entering his plea." *Id.* at R. 7(a). Whatever the source or authority is for the information given to those who appear in tribal court, the fact remains that CRST has no qualifications for determining when, and under what circumstances, the tribal public defender should be appointed to represent a criminal defendant.

pled NOT GUILTY, then it is your responsibility to immediately contact an attorney to represent you at your trial." Judge Gunville interpreted the quoted language to mean that the tribal public defender's representation of Defendant terminated after he entered his not guilty pleas in tribal court.[3]

3. Neither the CRST Public Defender Brenda Claymore, nor her assistant, Mound, are licensed professional attorneys. In fact, Claymore and Mound are not even active members, in good standing, with the courts of the CRST because they have not paid their bar dues as required.

4. Mound went to school until she was a sophomore or junior in high school and then obtained her GED. She has no college education and had not taken any legal training classes as of the time of Defendant's tribal arraignment. According to Claymore, all Mound was supposed to do is appear with defendants at their arraignments. And, January 4th was only Mound's second day on the job as an assistant public defender.

5. At no time during the January 13th meeting did Defendant ever advise Trone that he (Defendant) was represented by either an attorney or lay counsel. Nor was Trone aware then of the tribal charges that had been filed or that Mound had earlier appeared with Defendant for an arraignment in tribal court.

6. Significantly, tribal records do not show that Mound was even with Defendant at his January 4th arraignment. In fact, copies of the tribal court file that were received into evidence during the first evidentiary hearing, reflect that Defendant waived his right to counsel at the arraignment.[4]

[¶ 19] At the time of his polygraph examination and interview with Trone, Defendant had not even been charged with a federal offense. Although Defendant had been arraigned in tribal court and appeared with lay counsel there, this proceeding did not serve to trigger his right to counsel under the Sixth Amendment.[5]

---

**3.** Although Judge Gunville indicated that it was customary for the public defender to continue to represent defendants after their not guilty pleas, nonetheless, there is no documentation that exists to substantiate this custom. Apparently, the CRST courts, as a matter of policy, have someone from the public defender's office appear at tribal arraignments to assist defendants. Judge Gunville, however, testified that such a policy is an unwritten one and has not always been adhered to. She also acknowledged that where there is a conflict between provisions of the CRST Law and Order Code and tribal court policies, the former prevailed over the latter.

**4.** For some unexplained reason, the records on file with the tribal clerk that were admitted at the second evidentiary hearing contain one document that appears to have been changed some time after the first hearing, in an apparent effort to provide proof that Defendant did not waive his right to counsel during his arraignment. Paragraph 4 of the Arraignment Checklist, which Judge Gunville signed, was originally checked, indicating that Defendant had waived his right to counsel for arraignment purposes only. When that same Checklist was offered into evidence at the second hearing, it was crossed out. Judge Gunville was not able to explain how or why this occurred.

**5.** Nor can it be said that Defendant's tribal arraignment served as the "functional equivalent" of a federal arraignment on the sexual abuse charge so as to implicate the Sixth Amendment protections for the reasons already outlined above and, as explained below, because Defendant waived his right to counsel. *See United States v. Percy,* 250 F.3d 720, 725–27 (9th Cir.2001), *cert. denied,* 534 U.S. 1009, 122 S.Ct. 493, 151 L.Ed.2d 405 (2001).

Inasmuch as Defendant's Sixth Amendment right to counsel did not attach until his initial appearance in federal court, that right was not violated when Trone questioned him without the presence of counsel[6]. *See Plumman,* 409 F.3d at 926–27; *compare Red Bird,* 287 F.3d at 711–14.

**B.**

[¶ 20] Even if, somehow, Defendant's right to counsel attached at his arraignment in tribal court, nonetheless, his January 13th statements are admissible because he initiated the meeting and interview with Trone that day and waived his right to talk to or have counsel present with him before or during questioning. *United States v. Eagle Elk,* 711 F.2d 80, 83 (8th Cir.1983), *cert denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *Fields v. Wyrick,* 706 F.2d 879, 881–82 (8th Cir.), *cert. denied,* 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); *see Wyrick v. Fields,* 459 U.S. 42, 46–47, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).

[¶ 21] In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused, having expressed his desire to deal with law enforcement authorities only through counsel, is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself "initiates further communication, exchanges or conversation with [authorities]." The Supreme Court, however, went on to observe that an accused, in a meeting with authorities initiated by him, could validly waive his right to counsel if the waiver was knowing and intelligent and found to be so under the totality of the circumstances.

451 U.S. at 485–86 & n. 9, 101 S.Ct. 1880. While *Edwards* was decided on Fifth Amendment grounds, its pronouncements apply with equal force to the Sixth Amendment. *Jackson,* 475 U.S. at 631–35, 106 S.Ct. 1404.

[¶ 22] The rule in *Edwards,* just discussed, was not altered by the Supreme Court in *Jackson.* Rather, the *Jackson* Court simply held that if *police initiate* interrogation after a defendant has been arraigned or appeared in court at a similar proceeding, any waiver of the defendant's right to counsel for that *police-initiated* interrogation is invalid. 475 U.S. at 636, 106 S.Ct. 1404. *Jackson* thus left intact the validity of a knowing and voluntary waiver where a suspect has initiated the meeting with police and the questioning of him that flowed therefrom.

[¶ 23] Applying the *Edwards* rule to the case at hand, it must first be asked whether Defendant "initiated" the January 13th meeting, polygraph examination and interrogation with Trone. The Supreme Court's decision in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), provides guidance in answering this question. In *Bradshaw,* the four-justice plurality concluded that a reviewing court should look at whether a defendant's actions and conduct "evinced a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1045–46, 103 S.Ct. 2830. If so, the defendant is deemed to have "initiated" the meeting or conversation. *Id.* The four dissenters defined "initiation" more narrowly as "communication or dialogue *about the subject matter of the criminal investiga-*

---

6. Having made this determination, the Court need not delve into or decide the more controversial issue that has divided the circuits; namely, whether, as a result of the Supreme Court's decision in *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001),

the dual sovereignty doctrine applies in the Sixth Amendment right to counsel context and to the instant case. *See United States v. Coker,* 433 F.3d 39 (1st Cir.2005) (discussing this issue, the split among the circuits and the *Red Bird* case).

*tion." Id.* at 1053, 103 S.Ct. 2830 (Marshall, J., dissenting).[7]

[¶ 24] The Court in this case finds and concludes that under either of the *Bradshaw* tests, Defendant "initiated" the meeting with Trone and the events that took place thereafter at the Law Enforcement Center. At the conclusion of his interview with Bray and Garreau on October 27th, Defendant was asked and agreed to submit to a polygraph examination. On January 12th, CRST Detective James Norris came to Defendant's residence and informed him that a polygraph examiner would be in Eagle Butte the following morning. Defendant agreed to be there and the next morning traveled on his own to and voluntarily appeared at the Law Enforcement Center for the examination. After introductions were made, Trone gave Defendant a short description of what he planned to do that day and what the polygraph examination consisted of. Defendant then was read, and read himself, a polygraph interview consent form which advised him that he could refuse to take the test, could stop the test at any time, and could refuse to answer any individual questions. Defendant was also advised of his constitutional rights[8] and signed a form stating that he understood what his rights were and was waiving those rights at that time.

[¶ 25] Upon completing the polygraph examination, Trone told Defendant that his responses were indicative of deception and then continued questioning Defendant

without advising him of his constitutional rights. While being questioned, Defendant made inconsistent and inculpatory statements about the Turning Heart incident. Shortly before 3:00 p.m. that afternoon, Defendant terminated the interview and left. At no time during the interview did Defendant ever ask for the assistance of counsel or invoke any of his rights.

[¶ 26] These facts are indistinguishable from those in *Eagle Elk* and *Fields.* Defendant agreed to take a polygraph examination and appeared voluntarily for the examination without counsel. He executed consent and waiver forms, acknowledged that he understood his rights, and agreed to answer questions without counsel present. At no time during the examination or the questioning that followed it did Defendant ever request the assistance of counsel. On these facts, it is clear that Defendant "initiated" the meeting and dialogue that occurred January 13th. *Eagle Elk,* 711 F.2d at 83; *Fields,* 706 F.2d at 881–82.

[¶ 27] Having concluded that Defendant had "initiated" the meeting that led to his interrogation and incriminating statements, the Court must now determine whether he waived his right to counsel. After careful review of the record, the Court is convinced that Defendant waived this right.

[¶ 28] It is clear from the record that Defendant was fully informed of his right to counsel and that he expressly waived this and other constitutional rights prior to the commencement of the polygraph examination and any interrogation.[9]

7. The remaining justice, who concurred in the judgment, found it unnecessary to determine whether the defendant "initiated" the encounter with police and concluded that his confession was admissible because he "knowingly and intelligently waived his right to counsel." 462 U.S. at 1049–51, 103 S.Ct. 2830 (Powell, J., concurring in judgment).

8. The Advice of Rights and waiver form advised Defendant that he had the right to remain silent, to talk to a lawyer before any

questions were asked, to have a lawyer with him during questioning and to stop answering questions at any time and to speak to his lawyer.

9. The written waiver itself, that Defendant signed, constitutes strong evidence that he had a clear understanding of his rights and intended to and did give up the same. *See North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("An express written ... statement of waiver of the

In addition, Defendant's education, his training and experience as a police officer and the fact that he terminated the interview and walked out of the meeting room, weigh heavily in favor of a valid waiver. Like in *Eagle Elk* and *Fields,* the facts and circumstances here plainly show that Defendant voluntarily, intelligently, knowingly and intentionally relinquished his Sixth Amendment right to have counsel present during and in connection with the polygraph examination and any questioning that occurred incident to it. *Eagle Elk,* 711 F.2d at 83; *Fields,* 706 F.2d at 881–82; *see also Wyrick,* 459 U.S. at 46, 103 S.Ct. 394; *Black Bear,* 422 F.3d at 664–65; *Vassar v. Solem,* 763 F.2d 975, 977–78 (8th Cir.1985); *United States v. Iron Thunder,* 714 F.2d 765, 771–72 (8th Cir.1983); *United States v. Black Spotted Horse,* 120 F.Supp.2d 802, 809 (D.S.D.2000).[10]

[¶ 29] Accordingly, Defendant's statements to Trone and Bray on January 13th were not obtained in violation of Defendant's Sixth Amendment right to counsel and may be used by the Government in its case in chief at trial.

## V.

[¶ 30] Lastly, Defendant seeks to suppress any testimony concerning the fact that a polygraph examination was administered and the outcome of the same. He argues that polygraph evidence is unreliable, not relevant, and even if marginally relevant, is more prejudicial than probative and should be excluded under Fed.R.Evid. 403. Although Defendant's attempt to "suppress" any reference to the polygraph, and the opinions concerning his performance on it, is really a motion in limine, the Court will address Defendant's assertion for expediency purposes.

[¶ 31] Defendant's argument has support among the case law of the Supreme Court and Eighth Circuit. In *United States v. Scheffer,* 523 U.S. 303, 309–12, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the Supreme Court held that polygraph evidence is of questionable reliability and that the President did not act arbitrarily or disproportionately in promulgating a per se rule excluding all polygraph evidence. The Eighth Circuit, citing *Scheffer,* later affirmed the exclusion of polygraph evidence under Rule 403 based on the collateral nature of such evidence and the confusion it would likely create if admitted at trial. *Waters,* 194 F.3d at 930. While polygraph evidence may not be per se inadmissible in the Eighth Circuit and could potentially be admitted in the absence of a stipulation from the Government, *see United States v. Rouse,* 329 F.Supp.2d 1077, 1083 (D.S.D.2004), *aff'd,* 410 F.3d 1005, 1011 (8th Cir.2005), the Court believes that such evidence, if allowed, would be unduly prejudicial and should accordingly be excluded in this case. Such a view is consistent with both Supreme Court and Eighth Circuit precedent and that of this District. *See Scheffer,* 523 U.S. at 309–17, 118 S.Ct. 1261; *United States v. Gianakos,* 415 F.3d 912, 925 (8th Cir.), *cert denied,* — U.S. —, 126 S.Ct. 764, 163 L.Ed.2d 593 (2005); *Waters,* 194 F.3d at 930–31; *Rouse,* 329 F.Supp.2d at 1083–86.

## VI.

[¶ 32] Based on the foregoing and in accordance with § 636(b)(1), the Court

---

right to remain silent or the right to counsel is usually strong proof of the validity of that waiver ...."*).

**10.** Defendant likewise waived his right to counsel under the Fifth Amendment for the same reasons. *Wyrick,* 459 U.S. at 46–49, 103 S.Ct. 394; *Black Bear,* 422 F.3d at 664–65; *Eagle Elk,* 711 F.2d at 83; *Fields,* 706 F.2d at 881; *see also Vassar,* 763 F.2d at 977–78; *Iron Thunder,* 714 F.2d at 771–72; *Black Spotted Horse,* 120 F.Supp.2d at 809.

hereby RECOMMENDS that Defendant's Motion be granted in part and denied in part. The Motion should be granted to the extent that it seeks to exclude the fact that the polygraph examination was administered to Defendant and the outcome of that examination, but should be denied in all other respects.

February 3, 2006.